**TOTAL SAFETY SERVICES, INC.**
**218 MAGNOLIA STREET**
**LONG BEACH, MISSISSIPPI 39560**

**ACCIDENT INVESTIGATION – SAFETY CONSULTING - LITIGATION SUPPORT**

# CLIFTON BADEAUX
# VERSUS
# EYMARD BROTHERS TOWING COMPANY, INC., ET AL

**DATE**
**July 14, 2021**

**CIVIL ACTION: 19-13427**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**JUDGE SARAH S. VANCE**
**MAGISTRATE JUDGE DOUGLAS**

**Prepared for**

## MS. KRISTI A. POST
## BLAKE JONES LAW FIRM
## 701 POYDRAS STREET, SUITE 4100
## NEW ORLEANS, LOUISIANA 70139

**TELEPHONE NO.:(504) 415-0945**
**111TOTAL@GMAIL.COM**

**EXHIBIT 1**

# INTRODUCTION

This **preliminary** ROOT CAUSE ANALYSIS report investigates the accident that occurred on the ARTCO dock (Spar Barge ***AB227b***), The Canizaro Fleet dock/barge, owned by ARTCO, located at the St James Fleet, near Luling, Louisiana, on or about January 3, 2019, and outlines the findings from that investigation.

# QUALIFICATIONS

***Please see my Curriculum Vitae for a further explanation of my qualifications as a Safety Professional.***

**QUALIFICATIONS:** A safety professional, in any given industry, is required to have a working knowledge of the various operations his company performs in that industry, as well as a working knowledge of the applicable governing regulations. I have over 50 years of safety experience in the industries relating to the exploration, production, and transport of oil and gas and the marine, general, and commercial industries. While working in these industries, I have developed expertise relating to safety issues on production platforms, barges (derrick, crane, pipe laying, dredging, drilling, jack-ups, lift-boats, spud, supply, deck, oil, tank, etc.), structural, fabrication yards, and vessels/boats (ship, MODU, tug, tow, supply, crew, etc.), and commercial and industrial buildings and building projects.

This on-the-job work experience began in the mid-sixties while working offshore in the Gulf of Mexico on production platforms and drilling rigs, performing the duties of a Roustabout, Rigger, Welder's Helper, and Wireline Operator. I also worked on the Mississippi River, worked in Fabrication yards and Shipyards as a Roustabout, Rigger, Welder's Helper, and Heavy Equipment, and Crane Operator. Further safety experience and expertise were derived from being the manager/supervisor of the Safety Department for Amerada Hess Corp. (Lafayette region); J. Ray McDermott, Inc. (Marine and Diving Divisions, Harvey Group), McDermott International, Inc. (Singapore, South East Asia Group) and the president or owner of Contract Safety Consultants, Preferred Employees, and Total Safety Services, Inc. Companies I worked for included, New Orleans Stevedores, Houma Welders, Smith Wallander, Boland Machine, and Manufacturing. My safety consulting experience was gained by providing safety consultant services at the following: Gulf South Laboratories, Engineering Inspection and Investigation, Inc., Inspection Consultants, Inc., Ray Gibbins Industries, Allied Wireline, Western Wireline, Popich Brothers, Space, L&L Construction, Kaough & Jones, Kranco, Garza Welding, T & A Wireline, TCB Industries, Rembco, Foley Construction, Delta Coatings, Delta Temp, Inc., Cortex, Southern Environmental Control, Eagle Marine, American Marine, Mosby Enterprises, Total Marine Services, Vela Garage, Doomlar, Energy Drilling, Grady Crawford, Guilliot Construction, J & J Electric, Taylormade Enterprises, U. S. Abatement, Vogt Construction, Wescorp Construction, and Blake Drilling,

The companies I was employed by or contracted with followed the Federal regulations listed below and voluntarily followed the Industry Standards of Care as listed. As their safety officer, I was required to have a

working knowledge of those regulations and standards of care and the ability to apply them to the company's oil and gas exploration and productions and marine, general, industrial, and commercial work activities.

**Subcategories for each section are listed in more detail in my *Curriculum Vitae.***

**Working knowledge of Federal Regulations 29:**
1910 General Industry, 1926 Construction, 1915 Shipyard, 1918 Longshoring, 1919 Gear Certification

**Working knowledge of Federal Regulations 46:**
Subchapter C - Uninspected Vessels
Subchapter D – Tank Vessels
Subchapter H – Passenger vessels
Subchapter I - Cargo and Miscellaneous Vessels
Subchapter I-A - Mobile Offshore Drilling Units
Subchapter K – Small Passenger Vessels carrying more than 150 passengers
Subchapter L – Offshore Supply Vessels
Subchapter M – Towing Vessels
Subchapter T – Small Passenger Vessels

**Working knowledge of Federal Regulations 33:**
Subchapter B – Offshore
Subchapter N - Outer Continental Shelf Activities

**Working knowledge of the following industry standards:**
(API) American Petroleum Institute
(ANSI) American National Standards Institute
(ASME) American Society of Mechanical Engineers
(AWS) American Welding Society
(CGA) Compressed Gas Associations, Inc.
(ASTM) American Society for Testing and Materials
(ABS) American Bureau of Shipping
(NFPA) National Fire Protection Association
(NIOSH) National Institute for Occupational Safety and Health
(SAE) Society of Automotive Engineers
(UL) Underwriters Laboratories
(NEC) National Electrical Code
(AWO) American Waterways Operators
(ISM) International Safety Management
(SSPC) Steel Structures Painting Council.

# METHODOLOGY – ROOT CAUSE ANALYSIS

The evaluation tool I use to investigate and analyze an accident is based on widely recognized and accepted accident investigation analysis principles and methods employed in the safety profession: the **ROOT CAUSE ANALYSIS (RCA)**.

My **ROOT CAUSE ANALYSIS (EVENTS AND CAUSAL FACTOR ANALYSIS)** is used to investigate this accident and my report is a structured step-by-step technique and procedure for ascertaining and analyzing the causes of accidents. The PROBLEMS AND DEFICIENCIES listed below in my report are examples of the major accident categories that should have been included when the crew completes a **(JSA)** and would be included in a ROOT CAUSE ANALYSIS investigation:

**EXEMPLARY MAJOR ACCIDENT CATEGORIES**
**EQUIPMENT / MATERIAL PROBLEMS,**
**PROCEDURE PROBLEMS,**
**DESIGN PROBLEMS,**
**TRAINING DEFICIENCIES,**
**MANAGEMENT PROBLEMS.**

Examples of the accident subcategories listed in my report address the specific accident PROBLEMS AND DEFICIENCIES related to the accident:

**EXEMPLARY SUBCATEGORIES**
**DEFECTIVE TOOLS / EQUIPMENT,**
**PRE-EMPLOYMENT EMPLOYEE EVALUATION,**
**PRE-JOB / EMPLOYEE EVALUATION (JSA),**
**PERSONAL PROTECTIVE EQUIPMENT,**
**TRAINING / CERTIFICATION / LICENCES,**
**FEDERAL AND /OR STATE STANDARDS / INDUSTRY STANDARDS,**
**INDUSTRY SAFETY MANUALS AND PUBLICATIONS.**

# ROOT CAUSE ANALYSIS

## I. DATA COLLECTION

The following documents were reviewed in preparation for this preliminary Root-Cause-Analysis report:

**Deposition Testimony:**

- Mr. Charles Walker
- Mr. Clifton Badeaux
- Mr. Arron Hartman
- Mr. Jacob Vega
- Mr. Keith Haydel, Jr.
- Mr. Land Lebrun
- Mr. Richard Martin
- Mr. Tyrone Thompson

**Miscellaneous documents:**

- **ADM & ARTCO ANSWERS TO INTERROGATORIES**
- **PHOTOGRAPHS PRODUCED BY MR. K SMITH**
- **EYMARD BROS. TOWING, INC. – SUPERVISOR'S ACCIDENT INVESTIGATION REPORT**
- **INCIDENT STATEMENTS: MR. GARY LERILLE, MR. KEITH HAYDEL, AND MR. CLIFTON J. BODEAUX**
- **SITE DRAWINGS**
- ***M/V PEARL EYMARD* – ROUGH MASTER'S LOGS**
- **SAFETY MEETING RECORDS**
- **MISC. PHOTOGRAPHS**

# II ACCIDENT DESCRIPTION

Mr. Clifton Badeaux was employed by Eymard Brother's Towing, Inc. as a Captain and assigned to work aboard the ***M/V PEARL EYMARD.*** Mr. Keith Haydel was Mr. Badeaux's relief aboard the vessel and had moored the ***M/V PEARL EYMARD*** on the Spar Barge ***AB227b,*** located at The Canizaro Fleet dock/barge, owned by ARTCO, located at the St James Fleet, near Luling, Louisiana.

The Spar Barge ***AB227b*** was a modified open Hopper barge. In order to widen the walkway, the river-side coaming had been removed and replaced with a standard open grating walkway and chain handrails. It appears that the new walkway consisted of 3' wide sheets of open bar grating installed inside the outer gunnel of the barge. The width of the walkway would have been approximately 5 to 6 feet wide and extended the entire length of the barge. While the open bar grating walkway provides the crewmembers the best slip resistant footing, the outer gunnel of this barge had to have a non-skid coating applied to raise the coefficient of friction to an acceptable level.

Mr. Clifton Badeaux arrived at location and walked along the modified walkway until he reached his vessel. Mr. Badeaux testified that he reached for the flag atop the starboard push knee and attempted to step from the barge to the fleet deck of the ***M/V PEARL EYMARD.*** As Mr. Badeaux stepped towards the vessel with his left foot his right foot slipped on the Spar Barge ***AB227b's*** gunnel. Mr. Badeaux sustained his injuries at this time.

# III ASSESSMENT / OPINIONS

***The following opinions are preliminary and may be amended, added to, or changed as other discovery and deposition testimony is provided.***

# OPINION NO. 1

## EQUIPMENT PROBLEM

**ARTCO'S FAILURE TO PROVIDE MR. BADEAUX WITH A SAFE MEANS OF INGRESS/EGRESS TO AND FROM HIS VESSEL FROM THEIR DOCK.** It is my opinion based on my education, training, and experience that ARTCO failed to provide Mr. Badeaux with a safe dock to make crew change from. Photographic evidence and testimony indicate that the gunnel section of the walkway on the Spar Barge ***AB227b*** did not have a non-skid coating sufficient to afford Mr. Badeaux with a safe walkway.

Photographic evidence shows a deck that has most of the non-skid coating worn off of it. Testimony indicates that the non-skid coating was worn on the gunnel section of the walkway. Although some testimony indicates that other crewmembers had made the same or similar transfers from the dock to the vessel several times, this does not negate the fact that some areas of the walkway did not have the requiest non-skid coating on it.

Additionally, Eymard's Incident Report, filled out by Mr. Gary Lerille, Safety Manager, further confirms the conditions of the deck of this barge. Mr. Lerille states that the deck was wet with rain. He also states that the deck was slippery, and he was recommanding that ARTCO add non-skid to the deck.

**OPEN BAR GRATING:** ARTCO installed a length of open bar grating along the gunnel of the Spar Barge ***AB227b*** to widen the barge's existing gunnel. It is unknown at this time why ARTCO didn't just add a second length of open bar grating to the uncovered section of the gunnel of the Spar Barge ***AB227b***. Open bar grating is the best surface for the prevention of slipping in almost every environment, but especially when the environment exposes the walkways to oil, snow, rain and grain dust.

**COATING MAINTENANCE:** Mr. Arron Hartman was ARTCO'S barge maintenance manager. Mr. Hartman testified that he coated the Spar Barge ***AB227b*** at least once a year. However, the photographic

evidence indicates that the coating on the barge when the photographs were taken had deteriorated to such a point that any non-skid coating remaining on the deck was difficult to identify from the photographs.

**MAINTENANCE PROCEDURE:** Mr. Hartman testified that his surface preparation for applying new paint would be to pressures wash the deck. Pressure washing a surface will remove any contaminate from the surface, but will not produce a sufficient surface profile for the paint to adhere to. Only a sand blasting operation will sufficiently prepare a surface for painting. For this type of use, an Industrial Blast or a Near White blast would be typically require to good paint adherence.

The testimony also indicates that the Spar Barge ***AB227b's*** gunnel was wet with rain and had a coating of grain dust on it at the time of Mr. Badeaux's accident. This would mean that the already hazardous barge deck, with limited amount of non-skid material on it, would be made worst by adding rain and grain dust.

**PAINT PRODUCT USED:** Mr. Hartman testified that ARTCO used a water-based paint to coat the gunnel of the Spar Barge ***AB227b.*** A water-based paint will not provide the user with a sufficient amount of wear resistance for the paint to stay adhered to the surface. Additionally, because water-based paint is soft, it will wear must faster than an epoxy paint. With a non-skid medium added to the epoxy paint, such as sand, walnuts shells, or black beauty, the coating will last for an extended period compared to a water-based paint. A good primer and two coats of epoxy paint would have provided Mr. Badeaux with a safe take off point on the gunnel of the Spar Barge ***AB227b***.

**CODE OF FEDERAL REGULATIONS
TITLE 29 - LABOR
SUBTITLE B - REGULATIONS RELATING TO LABOR
CHAPTER XVII -- OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION
DEPARTMENT OF LABOR
PART 1917 - SAFETY AND HEALTH REGULATIONS FOR MARINE TERMINALS**

**Subpart: 1917 Subpart B - Marine Terminal Operations**
**1917.12: Slippery conditions.**
The employer shall eliminate, to the extent possible, conditions causing slippery working and walking surfaces in immediate work areas used by employees.

**CODE OF FEDERAL REGULATIONS
TITLE 29 - LABOR
SUBTITLE B - REGULATIONS RELATING TO LABOR
CHAPTER XVII -- OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION
DEPARTMENT OF LABOR
PART 1910 - SAFETY AND HEALTH REGULATIONS FOR GENERAL INDUSTRY**

**Subpart D:Walking-Working Surfaces**
**1910.22: General requirements.**
**1910.22(a) Surface conditions.**
The employer must ensure:
**1910.22(c) Access and egress.**
The employer must provide, and ensure each employee uses, a safe means of access and egress to and from walking-working surfaces.
**1910.22(d) Inspection, maintenance, and repair.**
The employer must ensure:
**1910.22(d)(1)** Walking-working surfaces are inspected, regularly and as necessary, and maintained in a safe condition;
**1910.22(d)(2)** Hazardous conditions on walking working surfaces are corrected or repaired before an employee uses the walking-working surface again. If the correction or repair cannot be made immediately, the hazard must be guarded to prevent employees from using the walking-working surface until the hazard is corrected or repaired; and
**1910.22(d)(3)** When any correction or repair involves the structural integrity of the walking-working surface, a qualified person performs or supervises the correction or repair.

# OPINION NO. 2

## FAILURE TO USE STOP WORK AUTHORITY PROBLEM

**ARTCO & EYMARD BROTHER TOWING'S FAILURE TO USE THEIR STOP WORK AUTHORITY AND ABATE THE SLIPPING HAZARD THAT WAS PRESENT ON THE GUNNEL OF THE SPAR BARGE *AB227B*.** It is my opinion based on my education, training, and experience that ARTCO had a responsibility to inspect this barge on a regular basis and to report any unsafe conditions to the management and staff at ARTCO to have the unsafe condition abated. Either the person or persons resposnbile for inspecting the facility did not perform that duty, or failed to report the hazard of the slippery surface of the gunnel of this barge.

Mr. Jacob Vega testified that he visited the barge as Vessel Manager back in January 2019, two or three times a week, but never witnessed the ARTCO crew paining the barge and never report a slippery condition on the barge.

It is my opinion based on my education, training, and experience that Eymard Brother Towing's management and staff had a responsibility to inspect this dock and report back to either Eymard's management or ARTCO's management their findings.

**FEE SCHEDULE:**

Hourly charges are from portal to portal.
All expenses are reimbursed by the client.
$1920.00 for deposition and trial testimony (a minimum 3-hour charge, includes preparation time)
$320.00 per hour for all other services provided (fees are subject to annual increases).
$ 0.86 per mile for travel

The opinions found in this report are professional safety opinions relating only to this accident. While the expert opinions concern factual circumstances, which may be found by the trier of fact to constitute fault, they are not intended to be legal conclusions, as this is a matter for the court to determine and the trier of fact to decide. These opinions are based solely upon my many years of experience in the field of safety as it relates to this particular accident and should not be compared to other opinions in other cases.

If further discovery, research, inspections, and/or review should develop additional information that would alter my opinion, the conclusions reached herein would be subject to my revision and this report amended as necessary.

Sincerely Yours



Robert E. Borison
President
Total Safety Services, Inc.

# APPENDIX

## DEPOSITION TESTIMONY USED TO FORM MY OPINION

***This pagination may not follow the transcript of the official depositions.***

**MR. CLIFTON BADEAUX TESTIFIED AS FOLLOWS:**

Page 12:Q.·Okay.· And so your accident was in
Page 13: ·2018? ·2· A.·Yes, sir.
Page 15:·Q.·All right.· On this gangway, was there 18· ·a hand railing where your accident happened?
Page 15:They had a handrail right off the 23· ·side.· But when I was on the step on the boat, they
Page 15: ·didn't have to handrail there.
Page 16:·Q.·Did your slip and fall happen on a ·2· ·gangway? ·3· A.·It happened on the side of the barge, ·4· ·the dock barge I was walking on to get to my boat.

Page 16:·Q.·And did your accident happen at the 22· ·ARTCO St. James fleet? 23· A.·Yes, sir.· The ARTCO fleet.· That's 24· ·the one under the Luling Bridge.

Page 18:·Q.·All right.· And so at the time of your ·8· ·accident, were you assigned to the PEARL EYMARD? ·9· A.·Yes, sir.· That was my boat. 10· Q.·Were you the captain? 11· A.·Sir? 12· Q.·Were you the captain? 13· A.·Yes, sir.

Page 21:Q.·The gangway involved in your accident ·3· ·is a gangway you crossed over during a 14-day ·4· ·period -- ·5· A.·Yes, sir. ·6· Q.·-- 28 times.· Correct?

Page 21:Q.·Twenty-eight times? 14· A.·On a 14-day period.· Yep.· 28 times. 15· Q.·Both in daylight and after dark. 16· ·Correct? 17· A.·Yes, sir.

Page 21:Q.·Are you claiming that your accident 19· ·happened because the ARTCO gangway had lighting 20· ·problems, or was it sufficiently illuminated in your 21· ·judgment?

Page 22:They had lighting when I've been on ·3· ·it.· I mean, enough where you can see everything.· It ·4· ·was very well lit up.

Page 22:Q.·Okay.· Do you know whose gangway it 24· ·was? 25· A.·ARTCO.

Page 24:·Q.·Did the elevated grating on the deck, 18· ·what do you call that?· Is that the walkway on the 19· ·spar barge? 20· A.·Yes, sir.· They got the draining part 21· ·and they got some, like, a hand railing made out of 22· ·cable.· And they got the metal part where the 23· ·original barge is, the metal -- 24· Q.·All right. 25· A.·-- step.· That is where we tied our

Page 25: ·boat off. Q.·So most of the way you can walk to the ·3· ·boat is on the elevated grating.· And then do you ·4· ·have to step off of it and get onto the spar barge ·5· ·before you get on your boat? ·6· A.·Yes, sir.· You have to step off the ·7· ·grating onto the barge part, off that metal deck to ·8· ·get on my boat. Q.·And did you slip on the spar barge? 10· A.·Yes, sir.· It was on the barge itself. Q.·And did you slip on the metal grating 12· ·walkway or on the steel deck of the barge? 13· A.·Steel deck of the barge.

Page 28:Q.·And because you have 20 years training 10· ·as a captain, plus additional training as a deckhand, 11· ·if you thought mooring at that spot was unsafe, you 12· ·wouldn't do it.· Would you? 13· A.·It is just kind of what the situation 14· ·is, like, it is not my duty.· The nonskid was all 15· ·wore out.· It was not my duty to call ARTCO and tell 16· ·them they ought to nonskid their barges.

Page 30:Q.·Did you think that the conditions of 16· ·the ARTCO spar barge, either the part with the 17· ·grating or the steel deck, created a slipping or 18· ·tripping hazard? 19· A.·Steel deck created a slipping hazard 20· ·and they didn't have no nonskid.

Page 31:Q.·Well, okay.· I will rephrase it. ·9· Are you saying that there was an area 10· ·on the steel deck of the barge that you thought had 11· ·needed more nonskid? 12· A.·Yes.· They needed more nonskid.· Yeah. 13· ·A lot of the time.

Page 31:Q.·Okay.· And was that evident to you the

Page 32: ·very first time you stepped on the barge? ·2· A.·That I noticed it wasn't nonskid, it ·3· ·was all wore.· Yes, sir.· I knew.

Page 32:Q.·And who at Eymard did you report that ·8· ·to, that you were being asked to get on and off your ·9· ·vessel from an area at the ARTCO facility that lacked 10· ·nonskid? 11· A.·I never really mentioned it to nobody.

Page 32:Q.·You never notified anyone upstream 13· ·from you in the chain of command at Eymard, hey, man, 14· ·this area at ARTCO you are asking us to moor up to is 15· ·unsafe.· That is not something that you ever made 16· ·known to people upstream from you at Eymard.· Is that 17· ·right? 18· A.·I never told them, sir.
Page 33:Q.·Okay.· And if your employer, Eymard, 15· ·is also supposed to make sure you have safe ways to 16· ·get on and off your boat, they have to have somebody 17· ·in the company use their eyes and ears to make sure 18· ·everything is safe.· Right? 19· A.·Yes, sir.
Page 35:Q.·You should've said something.· You 19· ·should've said something here, because you already 20· ·knew it was unsafe before you got hurt.· Correct? 21· A.·I knew it was a slippery spot.· If it 22· ·was wet, it could cause a problem.
Page 35:Q.·And you knew on the day that you were 24· ·coming to work, when your accident happened, that you 25· ·had a slippery -- you had dampness.· Correct?
Page 36:A.·Yes, sir.· But I didn't tie the boat ·2· ·off there.· My relief did.
Page 38:Q.·Was it raining when you arrived at ·2· ·work that night? ·3· A.·Had a little mist.
Page 39:Q.·Were your boots worn, sir? 10· A.·They had a little wear and tear on 11· ·them from having them for a few months. 12· Q.·Were they slippery? 13· A.·No, sir.
Page 39:Q.·Had you ever sensed that those boots 15· ·were slippery before? 16· A.·No, sir.
Page 40:Q.·Did you have any gravel caught up in ·9· ·the bottom of the soles? 10· A.·Yes, sir.· I had gravel.· Had gray 11· ·paint on them from when I stepped on the deck one 12· ·time, I scratched the paint.· Still had gray paint 13· ·stuck to bottom of my boot.
Page 41:Q.·And to get onto the spar barge, do you 18· ·have to walk across some kind of gangway or plank 19· ·system? 20· A.·It is a gangway made out of grating, 21· ·and then they got the handrails on the side of it.
Page 42:Q.·And once you get up onto the spar ·3· ·barge, is that when you can step onto the, you know, ·4· ·the elevated grated part of the spar barge that has ·5· ·the chain handrail? ·6· A.·I had to walk about, roughly about 25, ·7· ·30 feet. ·8· Q.·On the steel decking?
Page 42:A.·Yes, sir.· It was on like the little 10· ·spot where the office barge was at.· You climb up 11· ·onto the spar barge.· Use the ladder or stairway to 12· ·climb up.· And I walked on the grating until I got to 13· ·the PEARL EYMARD and I stepped across onto the metal 14· ·deck to get on my boat.
Page 44:Q.·What are you carrying? 21· A.·Just had my bag I usually keep my 22· ·license and radar.· I had a little, one of those bags 23· ·I had my lunch in.
Page 44:Q.·Well, what kind of bags? 25· A.·It was just a Burger King bag.· I had
Page 45: ·stopped that day on my way to work.· Bought me some ·2· ·Burger King.
Page 45:Q.·When you were walking across the 22· ·office barge, did you have your bag with personal 23· ·effects in your hand or slung on your shoulder? 24· A.·It was on my shoulder.
Page 45:Q.·Did you have your burger bag in your
Page 46: ·hand or somewhere else? ·2· A.·That was on my right hand.· Same side ·3· ·I had my bag on.
Page 46:Q.·And when you went up -- when you ·5· ·walked across the deck barge, was there any grain ·6· ·dust on the barge? ·7· A.·On the deck barge, not right there ·8· ·where I was on the deck barge itself.· I didn't see ·9· ·that or feel none.

Page 46:Q.·Okay.· Same question with the flat 14· ·deck area where your accident occurred.· You didn't 15· ·see any grain dust there before your accident, did 16· ·you? 17· A.·Yeah.· You can see there was grain 18· ·dust mixed with the wetness of the barge.
Page 46:Q.·Before you stepped down off of the 20· ·area that had the grating, onto the flat deck where 21· ·your accident happened, did you look at that flat 22· ·deck? 23· A.·Yes, sir.
Page 47:Q.·Well -- all right. ·4· So are you claiming that there was ·5· ·grain dust visible to you, using your eyeballs, ·6· ·before you stepped off the grating onto the flat ·7· ·deck? ·8· A.·In the first place, they had an ·9· ·elevator right behind us.· So when they dig, dust 10· ·flies all over.· So yeah.· They had some grain dust 11· ·on the barge.
Page 47:Q.·All right.· I just want to know 25· ·whether you are claiming as part of your lawsuit that
Page 48: ·there was grain dust on the deck where you slipped? ·2· A.·They had some.
Page 49:Q.·All right.· And what you are telling ·3· ·us is, you can hold onto that handrail when you are ·4· ·walking along the grated area, but at some point you ·5· ·have to turn away from the handrail and walk towards ·6· ·your boat into an area that has no handrail. ·7· ·Correct? ·8· A.·Yes, sir.
Page 51:Q.·What is the PEARL EYMARD?· What kind 17· ·of boat is it? 18· A.·Just a spider boat.· I don't remember 19· ·how much horsepower it was.· But it was just a spider 20· ·boat.
Page 52:Q.·So that is why they call it a spider, ·4· ·because it has got what looks like spider legs ·5· ·leading up to the wheelhouse? ·6· A.·Pretty much.· Yes, sir.
Page 53:Q.·It was usual and customary for you to 10· ·moor the PEARL C EYMARD up to the spar barge at ARTCO 11· ·and step off without a gangway.· Correct? 12· A.·Yes, sir.· When we tie off the dock, 13· ·we step off from the boat onto the spar barge without 14· ·a gangway.
Page 55:Q.·And when you would transit from the ·4· ·spar barge onto the PEARL C EYMARD, was it a straight ·5· ·step across, or did you have to go up a stair or ·6· ·something? ·7· A.·It was just a straight step.· I had to ·8· ·step up.· The PEARL EYMARD was sitting a little ·9· ·higher than the spar barge.
Page 55:Q.·Okay.· And so how much did you have to 14· ·step up that night? 15· A.·About a foot and a half, two foot, 16· ·maybe.
Page 56:Q.·Am I right that on the day of your ·2· ·accident you never got that far? ·3· A.·I grabbed -- yes.· I had my hand on ·4· ·the push knee, the flagpole part.· When I went to ·5· ·step up, that is when I slipped. ·6· Q.·Well, did the foot on the PEARL C ·7· ·EYMARD slip or the foot on the deck of the spar barge ·8· ·slip? ·9· A.·The deck on the spar barge.
Page 56:Q.·So why, if you already had -- did you 11· ·already have your other foot up on the PEARL C 12· ·EYMARD? 13· A.·No, sir.· I picked up my left foot to 14· ·step up and that is when my right foot came up from 15· ·underneath me.
Page 56:Q.·You put your left foot on the PEARL C 17· ·EYMARD.· Is that right? 18· A.·It was -- I can't remember if I 19· ·touched the boat yet or not.· It just -- it happened 20· ·so quick.· I did pick up my left foot to step on the 21· ·PEARL EYMARD, and the next thing I know my foot right 22· ·just come out from underneath me. 23· Q.·Was your -- which hand was on the 24· ·flagpole? 25· A.·My left hand.
Page 57:Q.·So you had your left hand and your ·2· ·left foot up and ready to step up? ·3· A.·Yes, sir. ·4· Q.·And your right foot remained on the ·5· ·spar barge and slipped out from under you? ·6· A.·Yes, sir.
Page 62:A.·Yes, sir.· It was still daylight when ·8· ·it happened, too.

Page 67:Q.·Let me ask you, Captain Badeaux, based 22· ·upon your experience, are you saying that the deck, 23· ·the steel deck next to the grated part of the spar 24· ·barge was safe or unsafe? 25· A.·I mean

Page 68:THE WITNESS: ·4· It was unsafe because of the nonskid, ·5· ·it didn't have enough nonskid.· The bit they had on ·6· ·it, it was just wore out.· I mean, it wasn't really ·7· ·--

Page 68:Q.·What did it look like? 10· A.·Some spots they had, you could see 11· ·where it was yellow and had the nonskid a little bit. 12· ·Some spots it was just metal, the barge, like the 13· ·rusted look.· Just sitting out being metal.

Page 68:Q.·Well, I've seen cases involving 15· ·nonskid where it is walnut, and other cases it is 16· ·sand.· In some cases it is a special kind of paint. 17· ·What kind of nonskid did it look like had been on 18· ·here before it wore off?· Could you tell? 19· A.·I'm assuming it was the paint kind, it 20· ·was mixed in the paint already and they rolled it on. 21· Q.·Did you see any nonskid on any of the 22· ·steel deck in the vicinity where your accident 23· ·happened? 24· A.·Right where I slipped at, very little, 25· ·if they did.

Page 103:Q.·Based on this photograph, can you tell ·2· ·me where in the photo you actually -- your right foot ·3· ·slipped on the deck? ·4· A.·Right about where my -- the guy's ·5· ·hand, you see the push knee on the boat against the ·6· ·dock? ·7· Q.·Yep. ·8· A.·That is why, like I say, I grabbed ·9· ·onto the flagpole handle and I went to step up.· When 10· ·I picked up my left foot to step up, that's when my 11· ·right foot come off.· I was closer to the push knee.

Page 103:Q.·Okay.· So if you were standing facing 13· ·your boat, am I right that push knee that we see in 14· ·Exhibit 1 would've been off to your left? 15· A.·Yes, sir.

Page 103:Q.·And so in this photograph you slipped 17· ·on the deck between the push knee and the top of the 18· ·cavil or cleat that we are looking at? 19· A.·That is a cavil, yes, sir.· I was 20· ·closer to the push knee.

Page 103:Q.·How much space -- how wide is it 22· ·between the end of the cavil and the push knee?· It 23· ·doesn't look like much space. 24· A.·Give or take, probably -- I don't know 25· ·-- eight feet, 10 feet.

Page 106:(Deposition Exhibit 2 marked for ·9· ·identification.) :Exhibit 3,

Page 111: Exhibit No. 4.·

Page 113:Q.·We got a January accident around 5:00 ·2· ·o'clock.· Isn't it dark then? ·3· A.·It wasn't dark all the way.· That's ·4· ·what I'm saying, you can still see a little light.  in Exhibit 5

Page 113:Q.·Can you see in Exhibit 5 that the deck ·8· ·is wet?  A.·No, sir.· You can see where it is damp 10· ·there in the light.

Page 113:(Deposition Exhibit 6 marked for 12· ·identification.) 13· Q.·One more photograph.· And photograph 14· ·6, that shows a little more close-up of your shoes. 15· ·Those shoes are worn out, aren't they? 16· A.·No, sir.· Got a little wear to it, but 17· ·it is not worn out.

Page 117:Based upon your 20 years experience as ·2· ·a captain and your additional years of deckhanding, ·3· ·and the associated training you have received in ·4· ·regard to safe operations, in addition to the ·5· ·experience, do you have a view as to why this ·6· ·accident happened, sir?

Page 117:THE WITNESS: 10· Well, I mean, the nonskid on the barge 11· ·is the reason.

Page 117:Q.·Well, let me suggest one reason.· You 16· ·accept that as a captain working in the inland 17· ·transportation industry, you are tasked with and 18· ·obligated to keep an eye out for safety risks, aren't

19· ·you? 20· A.·On my vessel.· That is not my 21· ·responsibility to keep up with safety things on 22· ·ARTCO's dock.

Page 186:Q.·You didn't lean in either direction ·8· ·when you picked up your foot? ·9· A.·Just picked it up, went to step on the 10· ·boat and my right foot come from underneath me.

**MR. CHARLES WALKER TESTIFIED AS FOLLOWS:**

Page 17: Q. Okay. Where are you currently employed? A. Eymard. Q. And what is your position there? A. Deckhand.

Page 22: Q. Okay. Does Eymard have any safety rules for getting on and off the boats? A. No.

Page 23: Q. Okay. Can you tell me an example of when you would not maintain three points of contact? A. If we are coming in to the dock and the boat and the barge is level, you would just step right on. But if there is any kind of height discrepancy, that is when you would grab on, step on, pull up.

Page 43: Q. Okay. Do you recall when you walked to the PEARL C EYMARD that day to get on your shift, do you remember what the deck of the dock barge looked like? A. No. Q. Okay. Did you notice particularly if it was wet or if there was grain dust on the deck? A. No. Q. Did you notice if it was slippery? A. No.

Page 43: Q. Do you know as an employee of Eymard, that if a surface is slippery that you should not step on it? A. Yes.

Page 44: Q. Okay. If you saw a condition at the dock barge, at the ARTCO fleet that you thought was unsafe, what would you do? A. Only thing we can do is report it.

Page 44: Q. Okay. Do you know what Captain Badeaux was supposed to do if he reported an unsafe condition? A. He would have to report to Mr.

Page 45: Lerille.

Page 45: Q. Have you ever seen an unsafe condition at the ARTCO fleet or dock barge? A. Yes. Q. What condition? A. Just grain dust on the surface. Q. And why is that unsafe? A. Sometimes it tends to get -- if it stays, it tends to get slippery.

Page 45: Q. Do you ever talk to any ARTCO employees or ADM employees at the ARTCO fleet or dock barge? A. No. We don't talk.

Page 45: Q. Have you ever reported an unsafe condition at the ARTCO fleet or dock directly to anyone that works for ARTCO or ADM? A. No.

Page 45: Q. On the day of Mr. Badeaux's accident, did you -- I think you previously said that you didn't particularly notice that there was a lot of grain dust around. Is that right? A. Yes.

Page 46: Q. Okay. So there is no requirement that your boots have nonskid soles?

Page 46: THE WITNESS: I'm not aware of a requirement.

Page 54: Q. So if the boat was higher or lower than the dock, you may have to maintain a three-point

Page 55: hold. Is that correct? A. Yes.

Page 60: Q. During that whole period of time you had never seen a condition on the dock which would alarm you to make either a stop work order or report a dangerous condition. Is that correct? A. Yes.

Page 68: Q. So you were stepping up onto the PEARL

Page 69: after Badeaux's accident on January 3rd of 2019, you would have stepped up from this spar barge or dock barge, as you call it, onto the bow of the PEARL where we are looking at. Is that correct? A. Correct.
Page 71: Q. In your experience when you worked at the ARTCO docks, at the facility where Captain Badeaux was injured, did you experience grain dust on the surface of the barges?
Page 72: THE WITNESS: You are saying do I see grain dust? There is always grain dust on the barge.
Page 79: Q. But when you boarded the vessel that evening, you didn't see anything that was dangerous on that spar barge? A. No. I didn't see anything.
Page 79: Q. No dangerous condition on the deck of the spar barge when you boarded? A. No.

**MR. AARON HARTMAN TESTIFIED AS FOLLOWS:**
Page 8: Q. What is your current position with ARTCO? A. I am assistant manager of the condo.
Page 8: Q. What are your duties in that position? A. I am over washing the barges and doing minor maintenance and repair.
Page 9: A. Ama, Louisiana. Q. Is that the -- A. It is like Mile 116. Q. Is that the facility that is adjacent to the grain elevator? A. In Ama, yes. Q. Yes. And it is used as a dock, also? A. Yes, ma'am. A wash dock.
Page 9: Q. Okay. And tell me what role you play currently in doing the deck maintenance of the barges in terms of applying paint and nonskid to the walking surfaces. A. When I was over that, we did
Page 10: maintenance at least every year on them deck barges out in the fleet. Q. Can you describe what the maintenance consisted of? A. It could be painting decks to pumping out tanks.
Page 10: Q. Tell me what would be involved when you would apply paint to the decks. A. We would prep the steel first and then roll paint, put nonskid. Q. Tell me what you would do to prep the steel. A. Pressure wash.
Page 10: Q. What kind of paint do you apply? A. A water base.
Page 10: Q. Water based? Is it a certain manufacturer or type of water-based paint that you used?
Page 11: A. Sherwin-Williams.
Page 11: Q. How many coats of the paint do you apply? A. We do it twice. Q. Two coats? A. Yes. Q. What type -- I'm sorry. A. I said two coats of paint with sand each time.
Page 11: Q. Do you mix the sand into the paint before it is applied, or do you apply a coat and then put sand, apply another coat, and add more sand? Describe -- can describe for me how you do it. A. Apply a coat, put sand, let it dry, apply another coat, put more sand.
Page 12: Q. Is there some type of a written schedule that you use to determine when various barges are painted? A. No, ma'am.
Page 12: Q. How do you know if it needs interim maintenance, other than once a year? A. I would go out and look at the barges.
Page 13: Q. Now, since you now have a different job, you said now you are the -- you have a survey crew and fleet maintenance supervisory position. Do you still perform that type of maintenance? A. No, ma'am. Somebody else is in that role. Q. Okay. Who has that job now? A. Brent Brown.
Page 13: Q. When my client's incident took place in January of 2019, you would have still been the person in charge of performing that maintenance? A. Yes, ma'am.

Page 13: Q. Do you remember who was on your crew that was doing the actual painting work at that time? A. Francis Comeaux, Gary Allerman and Michael Boudreaux.

Page 14: Q. Do you know, prior to your taking your new job position in July of 2019, when was the last time you had performed maintenance on any barge? A. Like probably June, July of '18.

Page 17: Q. Yes. Can you tell me if you recognize the area at the ARTCO facility that is depicted in this photograph? A. Yes, ma'am. It is the upriver end of the barge. Q. Of which barge? A. Right below our home base barge.

Page 18: The whole area of the deck from where the grating is to the very outside. BY MS. POST: Q. Okay. And you would agree the grating, you don't apply paint and nonskid to that portion, do you? A. No, ma'am. Only to the deck and all the fittings.

Page 18: Q. Okay. Can you tell from looking at this photograph, whenever it was taken, what the condition of the paint and nonskid was on the deck of this barge? MR. FLOTTE:

Page 19: THE WITNESS: It looks okay to me.

Page 19: Q. Okay. What color is the paint you normally put onto the barge? A. A yellow.

Page 19: Q. Do you know when is the last time that area had been painted before January 3rd, 2019? A. Like I told you earlier, June or July of '18. Q. June or July of '18. So this is what you would consider normal wear for six or seven months on this particular barge surface? A. Yes, ma'am.

Page 21: Q. Okay. And would it be fair to say that there are areas where you can see paint and areas where there appears to be no paint? A. Yeah.

Page 21: Q. And the same would be true with the nonskid, since it is in the paint. Correct? A. Yes.

Page 22: Q. Upriver end of the barge. Okay. so this is just showing a little bit more of that. And would you agree with me that in the portion of the barge between the grated area and the edge of the barge, there are areas where there appear to be paint and areas where there appear to be no paint? A. Lighter paint. Yes.

Page 26: Q. Okay. And I am going to zoom in a little bit on this

Page 24. It looks like -- I do not see very much yellow paint the whole length of the outboard side of this barge. Do you? A. I see some. Not much. Q. Okay. Just little bits of it. And if that was in April of 2020, that would have been a couple of months before annual maintenance that you told us about would be scheduled

Page 27: to take place. Correct? A. I don't have an answer for that. I wasn't in that department. Q. Okay. Assuming they kept the same schedule that you had when you were in charge of that, that would have been two to three months before the time it would have been to do the maintenance. Correct?

Page 27: I would say yes.

Page 27: Q. Okay. And you would agree with me that the paint and nonskid is almost completely gone by that time. Correct? A. At that picture. Yes.

Page 29: Q. Okay. Let's look -- I want to see if we can see further down the -- I want to see how much further down the barge we can see. So down here where I'm placing my cursor, you see where the end of that handrail, the chain handrail is? A. Uh-huh. Q. Okay. Is that the other end of the barge where the boats do use to get -- for people to get on and off the boats? A. Yes, ma'am. That would be the upriver end.

Page 29: Q. Paint the whole barge. So would it be fair to assume that the wear and tear on the other end where the people are using it to get on and off of barges is pretty much the same as it is throughout the length of the barge?

Page 29: THE WITNESS: I mean, you probably have a little more wear on the other end.

Page 32: And that looks like a little -- let's go down. And you see this photograph that is ARTCO 37. Can you tell me where that photograph was taken from? A. This is the upriver end of the barge.

Page 32: Q. Okay. So this is the area where boats would be tying off and crew members getting on and off of boats. Correct? A. Yes, ma'am.

Page 32: Q. Okay. A. At that first cavil. Q. Okay. The one down here almost at the top of the picture? A. Right.

Page 33: Q. Okay. So are these other blotchy areas, as you go further back toward the downriver side of the barge, are those areas that have some paint and nonskid? A. I would say yes.

Page 34: Q. Okay. And the gray areas that appear clear and don't have blotches, are those areas where the paint and nonskid is, for the most part, worn off? A. Yes.

Page 34: Q. That is it for that. Let's see. All right. Did you ever in performing your barge surveys, have to use the barge we were just looking at to get on and off of vessels that were moored to it? A. Yes. I have.

Page 35: Q. And you would move your survey boat so you could get the vantage point and examine the barge from the riverside? A. I would get off and walk the barge myself.

Page 35: Q. And if you thought that the barge needed to have paint on the walking surface areas that we have been looking at, more often than once a year, did you have the authority to get that paint and requisition the paint and the nonskid and get that work performed? A. I would pass it on to my manager. Q. Who was your manager? A. Dan Saunders. A. Fleet manager.

Page 38: Q. And what type of sand did you use in applying the nonskid surface? A. Black Beauty.

Page 40: Q. It sinks in. Is there some kind of a formula that you use to determine how much sand to put down? Like so much a yard, a square yard, or anything like that? A. No, ma'am. Just sprinkle it down. Q. How do you know how much to sprinkle? A. Until it looks like it has got enough nonskid in the paint.

**MR. TYRONE THOMPSON TESTIFIED AS FOLLOWS:**

Page 8: Q. And for how long have you been employed by ADM? A. About 5 and a half years.

Page 9: A. I was hired as a deckhand.

Page 9: Q. This incident that we are here to discuss occurred in early 2019, specifically, on January 3, 2019. Did you have a mate's license then? A. No.

Page 9: Q. What was your job position and title when this occurred? A. I was a Deckhand 3.

Page 10: Q. Got you. Specifically, on the date of this incident, on January 3, 2019, you were serving as a Deckhand 3 on what vessel? A. LOUISIANA PARADISE.

Page 12: Q. And when you say, worked out of the Canizaro Fleet, what does that mean? A. That means working in the Destrehan area. Q. And you make crew change from the dock barges that exist out of the Canizaro Fleet, correct? A. Yes.

Page 19: Q. Based on your experience walking on the dock barge immediately downriver from the home base, do you consider that dock barge to have adequate or sufficient antiskid properties? A. I don't know. Q. You have never had any issues walking on that barge? A. No, I ain't never had no issues walking on that barge.

Page 25: Q. The portion of the barge that is used as the dock, between the grated part of the walkway and the edge, is flat steel decking, correct? A. Yes. Q. And that decking is, at times, I guess, painted with paint; is that right? A. Yes. Q. What color is the paint? A. Yellow.

**MR. RICHARD MARTIN TESTIFIED AS FOLLOWS:**

Page 12: Q. Where are you currently employed?

Page 13: A. Eymard Towing.

Page 13: Q. And how long have you worked there? A. Fifteen, 16 years. Q. And what is your position? A. Deckhand. Q. And have you been a deckhand the entire time you have worked at Eymard Towing? A. Yes.

Page 16: Q. Okay. Does Eymard have safety rules for getting on and off of the boat? A. Yes. Q. Can you tell me what those are? A. Observe your surroundings; making sure it is safe to get off and on the boat. Three step, you know, like hold on, hold onto the flagpole, step up, both feet. You know. When both feet is back on

Page 17: the deck, and I'm safe, I will let go and proceed to where my -- I proceed to the galley. Q. Three points of contact? A. Yes, ma'am.

Page 19: Q. When you are doing crew change, when you are working on the PEARL C EYMARD, where do you do the crew change? A. Cannizzaro dock. Q. Is that an ARTCO property? A. Yes. Q. And how many times have you been there? A. Thousands of times over 16 years.

Page 20: Q. Can you write office on that? A. Office. And then this way you got some steps that come up here, stairs. And another barge is connected there, which is the spar barge. This one is open. This would be grating. About three feet or so would be grating, and then this would be solid steel. Q. Okay. A. Deck, usually painted yellow with nonskid. Q. Okay. A. And then it goes on several more barges, spar barges this way.

Page 22: Q. Can you describe TS where the turnstile is? A. Right up in this area. Then I would continue walking past the office.

Page 22: Q. Okay. Can you tell me about that? Where were you when the accident happened? A. In the galley.

Page 23: Q. Okay. Did you notice if there was grain dust around on the day of Captain Badeaux's accident? A. Always, every day.

Page 23: Q. Always grain dust. Was there any extra grain dust around that day? A. From any given day, it could be more or less. Q. Do you recall if that day there was a particular amount of grain dust that you viewed to be a slip hazard? A. No. Q. Do you recall the condition of the nonskid on the spar barge that day? A. No.

Page 24: Q. All right. So what time did you get to the ARTCO fleet on the day of Captain Badeaux's accident? A. Before 5:00. Q. Before Captain Badeaux had his accident, did you see him at all? A. No.

Page 25: Q. Okay. Can you put an X where he was? A. (Witness complies.)
Page 27: Q. Okay. I'm going to show you Martin 2. This is again the E-Incident Reports 000004 photo. A. Okay. Q. Can you tell me who, if anyone, you recognize in that photo? A. Only me.
Page 27: Q. Are you pointing to the man in the blue hard hat and the blue shirt? A. Yes. Q. Okay. Holding onto the flagpole? A. Yes. Q. On the push knee? A. Yes.
Page 28: Q. Okay. I'm going to show you some other photos. Okay. This is going to be Martin 3. And this is Bates numbered E-Incident Reports 000005. Do you recognize anybody in that photo? A. Yes. Q. Okay. Who do you see? A. Captain Keith.
Page 31: Q. Thanks. Are you required to wear a specific type of boot to work your job at Eymard? A. Yes. Q. What kind of boots are you supposed to have? A. Steel-toed boots.
Page 31: Q. Do they need to have nonskid soles? A. Yes, ma'am. Q. And who requires that? A. ARTCO, Eymard.
Page 32: Q. Is there a sign or anything that tells you when you get to the ARTCO fleet -- A. Yes. Q. -- what kind of footwear you are supposed to have? A. Yes. Q. Okay. Where is that sign? Can you draw it on your drawing? A. Before, and before, right here, we walk through the gate.
Page 37: Q. I just have a few questions for you. Let's see my notes here. You said that when you were boarding the vessel, you would go to that starboard side push knee where the boat was closest to the dock? A. Yes.
Page 39: Q. Okay. So are you aware of Eymard having any type of rule about maintaining three-point contact when you are moving from something at one level to a different level? Like, stepping from the dock to the boat? A. Yes.
Page 40: Q. Okay. But when you are stepping across, though, you are not able to maintain three-point contact, are you?
Page 40: Object to the form. THE WITNESS: Three-point contact, one hand is on the pole, one hand is on the -- one foot is on the boat and one foot is on the deck.
Page 45: Q. Okay. How often have you seen ARTCO personnel doing that type of work over 16 years? A. Maybe twice.
Page 45: Q. Okay. Do you remember what exact work you saw them doing? A. Painting yellow.
Page 45: Q. Do you know whether it was just paint or if it had some type of nonskid in it? A. It had nonskid. Q. How do you know? A. Because you can visibly see the sand that is in it.
Page 45: Q. Okay. Do you know if it was mixed in the paint, or did they paint it and then throw that
Page 46: sand-like substance on top? A. Mixed in.
Page 46: Q. Do you remember what the condition of the yellow paint and nonskid was at the time Captain Badeaux's accident took place? A. I would -- yes. Q. What did it look like, if you recall? A. Like it had been painted a long time ago. Q. A long time -- painted a long time ago? A. Yes.
Page 46: Q. And what about the nonskid, was it like it had been applied a long time ago? A. Yes.
Page 46: Q. When you say as though it was a long
Page 47: time ago, do you mean that it was very worn?
Page 47: THE WITNESS: Very worn.
Page 48: Q. Yeah. How often would Mr. Lirelle come out to that worksite?
Page 48: THE WITNESS: Once or twice every couple weeks to bring supplies.

**MR. LANE LEBRUN TESTIFIED AS FOLLOWS:**

Page 7: Q. Who is your current employer? A. Archer-Daniels, ARTCO.

Page 9: Q. And then, for how long have you served in the role of fleet mate? A. About 4 years. Q. As we sit here today, it has been approximately 4 years? A. Yes. Q. So in approximately 2017, you became a fleet mate? A. That sounds about right.

Page 23: Q. And based on your experience of traversing the dock barge at the Canizaro Fleet in early January of 2019, did you feel that it had

Page 24: sufficient nonskid properties? A. Yes, sir.

Page 24: Q. I take it, given the number of times you have done crew changes at the Canizaro Fleet, that you have done crew changes in many different weather conditions, correct? A. Yes, sir

**MR. JACOB VEGA TESTIFIED AS FOLLOWS:**

Page 8: Q. Who is your current employer? A. ADM.

Page 9: Q. What was your position when you were hired on by ADM? A. Management trainee. Q. And what is your current position? A. Fleet manager.

Page 11: Q. And what is the relationship of American River Transportation Company, which we will call ARTCO from here on, and Archer-Daniels? A. ARTCO is a wholly-owned subsidiary of

Page 12: ADM. Q. Who actually owns the six vessels that you oversee? A. ARTCO. Q. ARTCO owns and operates them? A. Correct.

Page 14: Q. Is that grain elevator part of what you refer to as the Canizaro Fleet, or is it a separate operation and location? A. It is completely separate.

Page 14: Q. How would you describe their relationship, if any? Is it just that they are geographically located next to each other? A. The relationship between the elevator and the fleet in regards to operation is simply that we fleet loaded barges for them until they can accept the barges to unload at the elevator.

Page 15: Q. And the dock itself, can you describe it? A. The dock is compromised of the main landing barge, like shown in those images, and two barges above that both have spuds. The two barges below that both have spuds on the upper and lower end of it, and there is an additional barge above on the upper end that is moored just with cable to the barge below it. Q. So is it a total of what we used to refer to as a barge, but six previously operable barges that are, in some form or fashion, tethered together? A. Yes.

Page 17: Q. Back in January of 2019, what was your title with ADM/ARTCO? A. Vessel manager.

Page 21: Q. As vessel manager, back in January of 2019, how frequently did you visit the Canizaro Fleet location? A. Roughly two or three times a week.

Page 21: Q. And what is the purpose of those visits? A. Visiting crews, inspecting the fleet, the boats, visiting for crew change. Q. You said visiting with crews, inspecting the fleet and inspecting the boats? A. Yes.

Page 21: Q. What actual activity would you perform to accomplish that inspection? A. A visual inspection of getting on a boat, looking at our barge tiers, making sure barges are moored properly and in good condition.

Page 22: Q. As part of your inspections you conducted back in January of 2019, did you inspect home base and the adjacent dock barges that comprised home base? A. Only for mooring purposes. Q. What do you mean by that? A. Wires are in serviceable condition, barges sitting flat.

Page 22: Q. How often would you actually walk upon the barges that comprise the dock barge depicted in Exhibit 1 back in January of 2019? A. Say, about once a week.

Page 25: Q. Again, going back to January of 2019, would the vessel crews for the ARTCO tugboats, would they make crew change at this dock barge system? A. Yes.

Page 29: Q. Do you know what the weather conditions were when you arrived at the location? A. Slight drizzle, but that's it.

Page 37: Q. So we are dealing with between 9 and 15 individuals who would be coming on and off ARTCO boats via the Canizaro Fleet back in January of 2019, correct? A. Correct. Q. Now, if there was an issue with the conditions out at the Canizaro Fleet where someone felt they were unsafe, to whom should that condition be reported? A. Me.

Page 37: Q. At anytime while you were serving in your roles within ADM/ARTCO, has anybody told you that the walking surface on the barge where you observed Mr. Badeaux was in bad shape? A. No. Q. Has anybody told you that they felt it was unsafe? A. No.

Page 38: Q. And you personally, again, walked on that particular barge's walking surface numerous times during your employment, correct? A. Correct. Q. And you personally have not experienced any issues walking on that surface, correct? A. Correct.

Page 40: Kristi, I am showing him E_Incident Report 0000006.

Page 40: Q. That appears to be Mr. Badeaux on the spine board, correct? A. Correct. Q. Do you know where this picture was

Page 41: taken? A. Yes. Q. Where? A. That is on the home base barge, the deck barge.

Page 47: Q. And the barge where the incident occurred, is that a barge owned by ARTCO? A. Yes.

Page 48: Q. Where is the kevel depicted in Exhibit 6? A. Right by his feet. This is it right here.

Page 55: Q. Would you encourage ARTCO personnel and third-party personnel, such as Eymard employees, to report any unsafe condition? A. Yes.

Page 74: Q. Does your employer have a schedule of maintenance for this barge that is depicted in this photograph? A. I'm not sure.

Page 74: A. We had a crew of people that would periodically do things, but the individual that would have been responsible, I don't believe there is a specific person, but the one that was over that crew would have been Aaron Hartman.

Page 75: Q. No grating. What kind of surface does that particular part, meaning that flat edge, have on it as a walking surface? A. It is a steel surface with paint and nonskid. Q. Who maintains the paint and nonskid? A. At that time, it would have been Aaron's crew.

Page 76: Q. Now, you said you visited this site two or three times a week to see your crews, correct? A. Correct. Q. How often would you see Aaron's crew painting or applying nonskid to the surface? A. I don't recall seeing them do it.

Page 79: Q. Down here, it says, on the same
Page, What environmental factors, and then in parentheses, it says, Unsafe conditions contributed to the accident. And it is written by hand. At the time, it was raining and the deck was slippery. He was just walking to boat.
Page 79: Q. And where it asks, What corrective actions can be taken to prevent reoccurrence, it says, Add more nonskid surfaces. Do you see that part? A. Yes.
Page 79: Q. And then right below that, it says, What corrective actions have been taken to prevent occurrence, and it says, I will recommend to ARTCO to add nonskid. Do you see that part?
Page 80: A. Yes.
Page 81: Q. So I take it you were able to observe the condition of the paint and the nonskid when you were doing that, correct? A. Yes.
Page 81: Would you agree that on the date of Captain Badeaux's accident, that the paint and nonskid on the edge of this barge were both barely there, barely existing?
Page 81: THE WITNESS: I'm not sure of the exact condition of the paint and nonskid at that time.
Page 81: Q. If someone testified that it was badly worn at the time, would you be in a position to dispute that statement?
Page 82: THE WITNESS: No.

**MR. KEITH HAYDEL, JR. TESTIFIED AS FOLLOWS:**
Page 28: Q. What about any slip or trip hazards, you are supposed to avoid those as well? A. Right. Always try to stay with the nonskid areas. Q. Do you have stop work authority? A. Yes.
Page 45: Q. Do you remember what the condition of the nonskid was? A. No, ma'am.
Page 45: Q. In general, did you ever note the condition of the nonskid on the dock barge? A. No, ma'am.
Page 67: Q. Do you know whether the yellow painted area of flat steel had any nonskid application on it? A. I'm not sure.
Page 67: Q. Would you agree with me that it is safe when you are walking on a barge surface that is flat like that, if the paint has nonskid properties, either in the paint itself or underneath the paint?
Page 67: THE WITNESS: Yeah. It would be safe if you got nonskid.
Page 67: Q. You don't remember if they had nonskid there where you walked that day or not, do you? A. No, ma'am.
Page 68: Q. Have you ever seen anyone performing any type of maintenance on that barge, whether it is painting the yellow stripe, or applying nonskid, or any other type of maintenance to the walking surfaces? A. No, ma'am. Not to my recollection.