UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CLIFTON BADEAUX                                      CIVIL ACTION

VERSUS                                                    NO. 19-13427

EYMARD BROTHERS TOWING                      SECTION "R" (3)
COMPANY, INC., ET AL.

## ORDER AND REASONS

On November 8 and 9, 2021, the Court conducted a two-day bench trial

on plaintiff Clifton Badeaux's claims of negligence under the Jones Act, 46

U.S.C. § 30104(a), and unseaworthiness under the general maritime law

against Eymard Brothers Towing Company, LLC ("Eymard"), as well as his

claim of negligence against American River Transportation Company, LLC

("ARTCO") and Archer-Daniels-Midland Company ("ADM"). The Court also

tried ARTCO and ADM's cross-claim against Eymard for contractual defense

and indemnity under the general maritime law.

This Court has original jurisdiction over this matter pursuant to the

Jones Act and the Court's admiralty jurisdiction under 28 U.S.C. § 1333. The

Court has supplemental jurisdiction over state-law claims against ADM and

ARTCO under 28 U.S.C. § 1367. After hearing live testimony and reviewing

all the evidence, the Court rules as follows. To the extent a finding of fact

constitutes a conclusion of law, the Court adopts it as such.  To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

## I.   FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFF'S CLAIMS

### A.   Factual Background

Clifton Badeaux brought this action because he was injured in the process of stepping from a spar barge onto Eymard's vessel, the M/V PEARL C. EYMARD, on January 3, 2019.  The spar barge was owned by ARTCO, a wholly owned subsidiary of ADM, and jointly operated by ARTCO and ADM. Plaintiff was employed by Eymard, and was a captain of the M/V PEARL C. EYMARD.  He was 46 years old at the time of the incident.  He resides in Raceland, Louisiana.

### 1.   The Incident

At approximately 5:00 p.m. on January 3, 2019, Clifton Badeaux arrived at ARTCO's Cannizzaro fleet in Destrehan, Louisiana, for a crew change with Keith Haydel, Sr., a fellow captain of the M/V PEARL C.

EYMARD (the "PEARL" or the "vessel").   It was lightly raining at the time of the accident, and uncovered surfaces were wet with rain.[1]

Badeaux walked from the facility's parking lot to the barge fleet across a metal gangway.  Upon his arrival at the barge fleet, Badeaux traversed a barge known as "Home Base," and walked up a series of steps to the spar barge AB 227b (the "spar barge" or the "AB 227b").[2]  The spar barge is floating structure, spudded to the river bottom, that operates as a dock where vessels are moored.[3]  Vessel crewmembers do their crew changes on the spar barge.  Along one side of the spar barge runs an open-grated metal walkway, which allows rain and grain dust to pass through.[4]  Running adjacent to the grated walkway, between the walkway and the water, is a metal surface.[5]  It is on this side of the spar barge that vessels are moored, and crews are changed.

After mounting the steps up to the spar barge, Badeaux walked along the grated walkway, and then turned right to the outboard edge of the spar barge, where the PEARL was moored.  He was positioned on the non-grated

---

[1]     Trial Testimony of Clifton Badeaux; Exhibit J-47 *passim* (Photographs of Accident Scene).
[2]     Trial Testimony of Clifton Badeaux.
[3]     Trial Testimony of Brent Boeckmann.
[4]     Exhibit J-47 *passim* (Photographs of Accident Scene).
[5]     *Id.*; Trial Testimony of Clifton Badeaux.

portion—that is, the metal surface—of the spar barge as he attempted to board the vessel. While other surfaces near the edges of barges at the ARTCO fleet were covered in yellow paint, mixed with a non-skid medium such as Black Beauty, photographs of the accident scene reveal that the portion where plaintiff's fall took place was not painted, and not coated with non-skid, at the time of the accident.[6] At the time of the accident, the surface of the spar barge in this area was smooth, slick, and wet with rain.[7]

Plaintiff was wearing a pair of boots that were heavily worn when the accident happened. He planned to buy a new pair soon, but had not gotten around to it.[8] Inspection of the boots reveals that the rubber soles were heavily worn down. Some portions of the boots[9] were so worn that the bottom rubber sole was completely gone, revealing the mid-sole of the shoe. While Badeaux testified that he believed these sections may have had gray paint on them, physical examination of the boots revealed that there was no paint on the shoes. Plaintiff's boots were not cleaned or otherwise altered between the date of his accident and the physical inspection at trial.

---

[6]     Exhibit J-47 *passim* (Photographs of Accident Scene).

[7]     *Id.*; Trial Testimony of Clifton Badeaux; Trial Testimony of Gary Lerille.

[8]     Trial Testimony of Clifton Badeaux.

[9]     Exhibit A-2 (Plaintiff's Boots).

4

At the time of his accident, Badeaux had a leather bag over his right shoulder, and a paper bag, containing a meal from Burger King, in his right hand.[10] He testified that he attempted to board the PEARL on the starboard side, near the pushknee.[11] The pushknee is a vertical structure on the outer edge of the vessel, with rubber affixed to the exterior. Badeaux states that he was standing on the surface of the spar barge when he grabbed a flagpole attached to the vessel with his left hand, and lifted his left foot off the surface of the spar barge.[12] He testified that his right foot, which remained on the spar barge, slipped forward, causing him to fall backward onto the spar barge. He testified that he bounced one foot off the surface of the spar barge, and landed with his feet hanging off the edge of the spar barge. He testified that he then pushed himself away from the PEARL using his hands, to avoid falling between the spar barge and the PEARL, and then "rolled" an unknown number of times before anyone approached him.[13] There are no known eyewitnesses to Badeaux's fall.

Badeaux was first approached by Jacob Vega, an ARTCO vessel manager.[14] As part of his job duties, Vega managed day-to-day operations of

---

[10]   Trial Testimony of Clifton Badeaux.
[11]   *Id.*
[12]   *Id.*
[13]   *Id.*
[14]   *Id.*; Trial Testimony of Jacob Vega.

three ARTCO vessels, exercised oversight of the spar barge AB227b, and monitored for safe practices at the ARTCO facility.[15]  At trial, Vega testified that, when he spoke to Badeaux shortly after the accident, Badeaux told him that he slipped on the "kevel" while attempting to board the PEARL.[16]  The kevel is a metal structure or cleat affixed to the surface of the spar barge.[17] Crewmembers tie mooring lines around the kevel to moor their vessels to the spar barge.  The kevel's top surface is thin and rounded.  ARTCO's General Operations Manager, Brent Boeckmann, testified that Vega told him on the evening of the accident that Badeaux said that he stepped on the kevel.[18] There is no written record, by Vega or anyone else, indicating that Badeaux reported stepping on the kevel in his attempt to board the PEARL.  Indeed, Gary Lerille, Eymard's Operations and Safety Manager, spoke to plaintiff at the hospital on the evening of his accident, and plaintiff did not tell him that he stepped on the kevel.[19]  Badeaux denies that he stepped on the kevel, and testified that he would never have done so because it is unsafe.[20]    He maintains that he attempted to step directly from the spar barge AB 227b,

---

[15]    Trial Testimony of Jacob Vega.
[16]    *Id.*
[17]    Exhibit J-47 at 10-11 (Photographs of Accident Scene).
[18]    Trial Testimony of Brent Boeckmann.
[19]    Trial Testimony of Gary Lerille.
[20]    Trial Testimony of Clifton Badeaux.

6

near the PEARL's starboard pushknee, and slipped on the surface of the spar barge.

The Court finds, by a preponderance of the evidence, that Badeaux slipped on the surface of the spar barge AB 227b, and not on the kevel. Keith Haydel, Jr., an Eymard deckhand at the time of the accident, testified that boarding and deboarding near the starboard pushknee was the standard method of ingress and egress from Eymard's vessels, because there are supports available for grabbing, and because the gap between the barge and the vessel is smallest at that spot.[21] At trial, plaintiff was emphatic that he would never have attempted to board via the kevel, because it is unsafe. Photographs of the accident scene confirm that using this as a means of ingress would have been foolhardy. The kevel is narrow, rounded, and slick. It sits farther from the vessel than the area of the spar barge near the starboard pushknee. The spot on the PEARL where one would land when stepping from the kevel is blocked by coiled rope and yet another kevel. And there is nothing near the kevel for a crewmember to hold onto when boarding. Based on this evidence, the Court discerns no plausible reason why plaintiff would attempt to board, nor any convincing indication that he did in fact board, the PEARL C. EYMARD from the kevel.

---

[21]    Trial Testimony of Keith Haydel, Jr.

Furthermore, a contemporaneous photograph of the accident scene depicts plaintiff's burger bag, which he was holding in his right hand as he attempted to board the vessel, sitting on the starboard side of the PEARL C. EYMARD, near the pushknee.[22]  There is no indication that the bag was moved before the photograph was taken, or that it landed in that spot by any means other than plaintiff's fall.  The bag's location, on the starboard side of the vessel, strongly suggests that plaintiff slipped and fell in that vicinity.  At trial, ARTCO's counsel speculated how the bag could have landed near the pushknee, even if plaintiff slipped on the kevel.  But counsel's speculation has no foundation in the evidence, and his theory would require a contorted maneuver in which plaintiff slips on the kevel, tosses his bag leftward, across his body, and across a substantial length of the spar barge, all as he is falling down onto the spar barge.  The Court credits plaintiff's testimony that this did not happen.[23]

Defendants' affirmative evidence in support of the kevel theory is unconvincing.  First, contemporaneous written records of the accident are completely devoid of any indication that plaintiff reported stepping on the kevel.  On the night of the accident, Jacob Vega, to whom plaintiff reportedly

---

[22]     Exhibit J-47 at 13 (Photograph of Accident Scene).
[23]     Trial Testimony of Clifton Badeaux.

told that he stepped on the kevel, sent an email stating that "Clifton Badeaux[] was stepping onto his boat from the spar barge below 121 home base[;] he lost his footing and fell backwards onto the deck of the spar barge, hurting his lower back."[24]  Vega's failure to mention the kevel in his emails is telling.  He testified at trial that he has never seen a crewmember, whether an ARTCO employee or otherwise, step from a kevel onto a vessel.[25]  Given this factual backdrop, one would expect that Badeaux's kevel statement would be especially noteworthy, warranting some mention in Vega's communications.  No such mention appears.

Furthermore, emergency-room ("ER") records from the night of plaintiff's accident make no mention of a kevel.[26]  And plaintiff's "Injured Persons Report," signed four days after the accident, states that he was "raising [his] left foot up to step on [the] boat, and [his] right foot slip[ped,] and [he] landed on [the] dock barge."[27]

---

[24]  Exhibit J-4 at 1 (Email from Jacob Vega, dated January 3, 2019, 6:50 P.M.).

[25]  Trial Testimony of Jacob Vega.

[26]  Exhibit J-22 at 33 (Report from Oschner Medical Center – Kenner) ("The patient was stepping on a barge when he slipped, fell 1 foot, and landed on his buttocks."); *id.* at 38 ("46 yo male with low back pain and vomiting after a fall from approximately 1 ft height while at work attempt[ing] to board a boat.").

[27]  Exhibit P-4 at 8 (Injured Persons Report, dated January 7, 2019).

Evidence in support of the kevel theory emerges for the first time at Jacob Vega's deposition on May 11, 2021,[28] over two years after plaintiff's accident.  Vega testified at trial that he did not know whether he told anyone before his deposition that Badeaux reported stepping on the kevel.[29]  And while Brent Boeckmann, ARTCO's General Operations Manager, testified that Vega told him on the night of the accident that plaintiff said that he stepped on the kevel,[30] Vega himself is unable to confirm that he reported this information to Boeckmann, or to anyone else, for that matter.[31]

The testimonial evidence in support of the kevel theory comes exclusively from Vega and Boeckmann, two ARTCO managers who oversee the facility's vessels and onsite operations, including on the spar barge where plaintiff claims to have slipped.  Both testified that they bear responsibility for employees' safety.  Vega specifically testified that he oversaw the spar barge AB 227b.[32]  And Boeckmann oversees all of ARTCO's employees, vessels, and property in the New Orleans area, including the spar barge AB 227b.[33]  Their testimony assigning fault to Badeaux must be assessed in light

---

[28]    Exhibit J-18 (Exhibits to Deposition of Jacob Vega) (indicating date of May 11, 2021).
[29]    Trial Testimony of Jacob Vega.
[30]    Trial Testimony of Brent Boeckmann.
[31]    Trial Testimony of Jacob Vega.
[32]    *Id.*
[33]    Trial Testimony of Brent Boeckmann.

of their interests as ARTCO safety personnel.  The Court finds that Vega and Boeckmann's testimony suggesting that plaintiff stepped and slipped on the kevel is not persuasive.

Other evidence on this issue is inconclusive.  For instance, photographs of the accident scene depict plaintiff's feet near the base of the kevel.[34]  But it is unclear how far the kevel on the spar barge is from the spot near the pushknee where plaintiff claims to have slipped.  The photos do not provide reliable depictions of this distance, because the length of the barge extends from the photographs' foreground into the background.  In some photos, plaintiff appears to be close to the starboard pushknee.[35]  The Court finds that, even if plaintiff did not bounce, push, and roll himself on the deck as he testified, his position in some of the photographs is consistent with having fallen near the starboard pushknee.  The photographs therefore provide little insight into whether plaintiff slipped on the kevel, or near the pushknee.

Finally, the Court rejects defendants' invitation to find that plaintiff's statement to ER personnel that he fell from "one foot"[36] means that he

---

[34]    Exhibit J-47 at 14 (Photograph of Accident Scene).

[35]    *Id.*

[36]    Exhibit J-22 at 33 (Report from Oschner Medical Center – Kenner) ("The patient was stepping on a barge when he slipped, fell 1 foot, and landed on his buttocks."); *id.* at 38 ("46 yo male with low back pain and vomiting after a fall from approximately 1 ft height while at work attempt[ing] to board a boat.").

stepped on the kevel.  Plaintiff did not mention the kevel to medical officials, nor is there any indication of the context in which plaintiff provided ER personnel with this "one foot" measurement.  In any case, the record lacks any reliable indication of key measurements at the accident scene, including the height of the kevel.  At trial, when asked about this measurement in the ER files, plaintiff testified that he told medical personnel that the height difference between the spar barge and the deck of the PEARL was approximately one and half to two feet, but that they may have misunderstood what he meant.[37]  For all of these reasons, the "one foot" figure as documented in the ER records is not probative as to either party's theory of plaintiff's fall.

In sum, the Court finds no convincing evidence that plaintiff slipped and fell on the kevel, and instead credits plaintiff's account of his fall.  The Court finds, by a preponderance of the evidence, that, on January 3, 2019, plaintiff attempted to board the M/V PEARL C. EYMARD near the starboard pushknee with his left hand on the flagpole, and his right hand holding his burger bag.  When he lifted his left foot to step up onto the vessel, his right foot slipped forward on the surface of the spar barge AB 227b, landing him on the surface of the spar barge.

---

[37]     Trial Testimony of Clifton Badeaux.

## 2.   *Injuries and Treatment*

EMS personnel arrived on the scene at 5:18 p.m.,[38] and transported Badeaux to Oschner Medical Center in Kenner, Louisiana, where he was admitted at 6:00 p.m.[39]   At Oschner, plaintiff reported acute back pain,[40] reaching a rating of 9 out of 10.[41]   Doctors found that plaintiff's pain was "localized to the top of his Lumbar spine."[42]   ER personnel ran a variety of tests and scans,[43] administered multiple doses of muscle relaxants and pain relievers,[44] and discharged plaintiff that same evening, at 8:52 p.m.[45]

An MRI taken four days after the accident indicated that plaintiff had compression factures of his L1 and L2 vertebrae, and "marrow edema throughout" those vertebral bodies.[46]   Edema refers to water in places where it should not be.[47]   The MRI also indicated approximately 40% height loss of

---

[38]   Exhibit J-21 at 9 (St. Charles Parish Hospital Emergency Medical Transport Records).

[39]   Exhibit J-22 at 22-23 (Records from Oschner Medical Center – Kenner).

[40]   *Id.* at 25.

[41]   *Id.* at 27.

[42]   *Id.* at 33.

[43]   *Id.* at 23-28.

[44]   *Id.* at 27-28 (documenting administrations of hydrocodone and injections of orphenadrine).

[45]   *Id.* at 20, 22, 29.

[46]   Exhibit J-25 at 235 (Louisiana Imaging Radiology Report, dated January 7, 2019); *see also id.* at 231 ("[T]he patient has compression fractures of L1 and L2.").

[47]   Trial Testimony of Dr. Everett Robert.

the L1 vertebral body, and approximately 10-20% height loss of the L2 vertebral body.[48]  During the subsequent seven months, plaintiff underwent a conservative course of care, including an epidural steroid injection, physical therapy, and medication.[49]

On July 11, 2019, plaintiff met with Dr. Sina Pourtaheri, a spine surgeon at Gulf Coast Orthopedics in Houma.[50]  At that appointment, plaintiff reported "minimal relief since the injury in January in terms of back pain."[51]  Following a physical examination, and a review of plaintiff's X-Rays and MRIs, Dr. Pourtaheri observed that the compression fractures had not healed, and that residual edema remained.[52]  He opined that it would be "very reasonable to consider" a kyphoplasty at L1 and L2.[53]  A kyphoplasty is a surgery involving the injection of bone cement into fractured vertebrae.[54]  Plaintiff decided to proceed with the surgery.[55]

---

[48]   Exhibit J-25 at 235 (Louisiana Imaging Radiology Report); *see also* Trial Testimony of Dr. Sina Pourtaheri.

[49]   Trial Testimony of Dr. Sina Pourtaheri; Exhibit J-23 at 4-5, 39 (Gulf Coast Orthopedics Patient Records).

[50]   Trial Testimony of Dr. Sina Pourtaheri.

[51]   Exhibit J-23 at 39 (Gulf Coast Orthopedics Patient Records).

[52]   *Id.* at 40.

[53]   *Id.*

[54]   Trial Testimony of Dr. Sina Pourtaheri; Trial Testimony of Dr. Peter Liechty.

[55]   Exhibit J-23 at 40 (Gulf Coast Orthopedics Patient Records).

On July 22, 2019, Dr. Pourtaheri performed an L1 and L2 lumbar kyphoplasty.[56] All testifying physicians agreed at trial that this procedure was medically appropriate.[57] In a follow-up visit on August 6, 2019, plaintiff reported that his pain had improved since the surgery, decreasing from pre-kyphoplasty levels of 6 to 9 out of 10, to post-kyphoplasty levels of 4 to 5 out of 10.[58] But on August 12, plaintiff reported to the ER at Terrebonne General Medical Center, complaining of acute lower back pain.[59] The following day, he underwent an MRI, which showed some edema and inflammation near the areas where the kyphoplasty had been performed.[60] On August 16, plaintiff again reported to the ER, with complaints of fever and back pain.[61]

On September 10, 2019, plaintiff attended a follow-up visit with Dr. Pourtaheri.[62] At this visit, Dr. Pourtaheri learned that plaintiff had not attended physical therapy, despite having been referred to physical therapy at his previous appointment.[63] He noted that plaintiff had "intermittent back

---

[56]   *Id.* at 10, 13 (Gulf Coast Orthopedics Consent Forms).

[57]   Trial Testimony of Dr. Everett Robert; Trial Testimony of Dr. Peter Liechty; Trial Testimony of Dr. Sina Pourtaheri.

[58]   Exhibit J-23 at 43 (Gulf Coast Orthopedics Patient Records).

[59]   Exhibit J-29 at 17, 19 (Records from Terrebonne General Medical Center).

[60]   Exhibit J-23 at 24-29 (MRI Results from Open MRI of Louisiana – Houma).

[61]   Exhibit J-29 at 50 (Records from Terrebonne General Medical Center).

[62]   Exhibit J-23 at 65 (Gulf Coast Orthopedics Patient Records).

[63]   *Id.*

soreness at most," and released him to return to work as a captain, without restriction.[64]   Records indicate that plaintiff was ordered to return for a follow-up appointment with Dr. Pourtaheri in three months,[65] but plaintiff and his wife testified that Dr. Pourtaheri did not instruct him to return, and that plaintiff believed that he had been fully discharged.[66]

After the September 10, 2019 appointment with Dr. Pourtaheri, plaintiff was still experiencing pain, and did not return to work.  He sought a second opinion from Dr. Peter Liechty, a neurosurgeon at the One Spine Institute in Metairie.  On examining plaintiff, Dr. Liechty found that plaintiff had limited range of motion at the thoracolumbar junction, and sensory complaints in his right leg.[67]  On September 18, 2019, Dr. Liechty ordered a SPECT/CT scan at Diagnostic Imaging Services in Houma.[68]  The SPECT/CT consists in part of a bone scan, in which a radioisotope is added to a phosphate tracer.[69] Diphosphate is a major building block in bone.[70]  Because these building-block molecules are "tagged," SPECT results depict sites of bone activity.  This is a

---

[64]    *Id.* at 65-66.

[65]    *Id.* at 31, 66.

[66]    Trial Testimony of Clifton Badeaux; Trial Testimony of Kimeline Badeaux.

[67]    Trial Testimony of Dr. Peter Liechty.

[68]    Exhibit J-32 at 26 (Diagnostic Imaging Services Radiology Services Estimate).

[69]    Trial Testimony of Dr. Bradley Shore.

[70]    Trial Testimony of Dr. Everett Robert.

nonspecific finding; bone activity can include inflammation, arthritis, infection, or other activity.[71]  This scan is superimposed onto a CT scan, so that the interpreter of the study can locate the site of the identified bone activity.[72]  Badeaux's SPECT/CT scan, dated September 23, 2019,[73] showed increased bone activity on the top side of L1, as well as the bottom side of the T12 vertebra, both near the site of his kyphoplasty.[74]  Plaintiff had not received any injection or prior surgical treatment at T12.  The SPECT/CT scan also showed that the bone cement in L1 was closely abutting the top side of L1.[75]

At trial, Dr. Liechty testified that, having reviewed plaintiff's SPECT scan, his opinion was that the top side of L1 had caved in, and that the bone cement in L1 had extended above the superior vertebral margin.[76]  Dr. Liechty also testified that plaintiff had a fracture at T12.[77]  He further testified that these conditions caused ongoing instability in this area of plaintiff's spine.[78]  At trial, Dr. Pourtaheri agreed that plaintiff's SPECT/CT scan showed bone activity at T12, but he noted that the activity could suggest a variety of issues,

---

[71]     *Id.*
[72]     Trial Testimony of Dr. Bradley Shore.
[73]     Exhibit P-2 at 10 (Letter from Dr. Liechty to Kristi Post).
[74]     Trial Testimony of Dr. Bradley Shore.
[75]     *Id.*
[76]     Trial Testimony of Dr. Peter Liechty.
[77]     *Id.*
[78]     *Id.*

including edema, posttraumatic arthritis, inflammation, or posttraumatic degenerative disc disease.[79]  Both Dr. Pourtaheri and Dr. Everett Robert, an independent medical examiner who evaluated plaintiff on November 8, 2019,[80] testified that plaintiff's scans indicated a Schmorl's node at T12.[81]  A Schmorl's node is a spinal disc herniation into the vertebral body.[82]  Dr. Pourtaheri testified that he believes that plaintiff's Schmorl's node at T12 caused the pain that prompted plaintiff's first ER visit after the kyphoplasty.[83]  Dr. Pourtaheri further testified that, regardless of the precise issue at T12, plaintiff's injuries were related to his fall on January 3, 2019.[84]

On October 15, 2019, Dr. Liechty recommended that plaintiff undergo a spinal fusion from T11 to L3, and vertebral-body augmentations at T12, L1, and L2, to stabilize plaintiff's spine and address the fracture activity at T-12.[85]  On February 18, 2020, Dr. Liechty performed the surgery he recommended.[86]  The procedure involved the installation of a metal rod, which Dr. Liechty testified was intended to restrict plaintiff's movement and give his vertebrae

---

[79]   Trial Testimony of Dr. Sina Pourtaheri.
[80]   Exhibit J-6 at 3 (Robert IME Report).
[81]   Trial Testimony of Dr. Sina Pourtaheri; Trial Testimony of Dr. Everett Robert.
[82]   Trial Testimony of Dr. Everett Robert.
[83]   Trial Testimony of Dr. Sina Pourtaheri.
[84]   *Id.*
[85]   Exhibit P-2 at 10 (Letter from Dr. Liechty to Kristi Post).
[86]    *Id.* at 16, 18 (Letters from Dr. Liechty to Kristi Post).

time to heal.[87]  He also inserted optimesh into plaintiff's disc spaces in this region, which he testified is an approved method of vertebral-body augmentation.[88]  On December 17, 2020, Dr. Liechty performed another surgery, to remove the titanium hardware in plaintiff's back.[89]  At trial, Dr. Liechty testified that it is his opinion that plaintiff's injuries were caused by his fall.[90]  Plaintiff is not scheduled for any future surgeries, but as of the date of trial, plaintiff was still taking narcotic pain medication.[91]

Based on the documentary evidence and the testimony presented at trial, the Court finds that plaintiff's accident caused all of his injuries, and necessitated all of his subsequent treatment, including the July 2019 kyphoplasty, the February 2020 fusion and vertebral-body augmentation, and the December 2020 hardware removal.  Plaintiff complained of severe pain in the months following his accident, and in the weeks following his release by Dr. Pourtaheri.  The Court finds that these complaints of pain were genuine, and are supported by the Terrebonne General medical records, the August MRI, the September SPECT scan, as well as the trial testimony of plaintiff, his wife, Dr. Pourtaheri, Dr. Robert, and Dr. Liechty.  Further, Dr.

---

[87]    Trial Testimony of Dr. Peter Liechty.
[88]    *Id.*
[89]    Exhibit P-2 at 36 (Harvard Surgery Center Records).
[90]    Trial Testimony of Dr. Peter Liechty.
[91]    *Id.*

Liechty opined that the fusion procedure he performed was necessitated by instability in plaintiff's spine, because of multiple-level fractures.[92]   And while Dr. Pourtaheri viewed Dr. Liechty's procedure as unnecessary, he agreed that a fusion was appropriate for fractures that result in instability.[93] *Cf. Lowry v. Overseas Bulk Tank Corp.*, 62 F.3d 397, at *3 (5th Cir. 1995) (affirming the district court's finding that plaintiff's accident on a vessel caused her injuries, despite "conflicting medical testimony").   The Court finds that Dr. Liechty's procedures were medically necessary, based on his expert opinions as a board-certified neurosurgeon,[94] evidence of the nature of plaintiff's injuries and symptoms, and medical records documenting plaintiff's examinations, tests, and treatments.

Accordingly, the record indicates by a preponderance of the evidence that plaintiff's accident caused his back injuries, and ultimately required the kyphoplasty, the spinal fusion and augmentation, and the hardware-removal procedure.   The Court therefore includes these medical expenses when calculating plaintiff's damages, and determining his entitlement to maintenance and cure.

---

[92]    *Id.*
[93]    Trial Testimony of Dr. Sina Pourtaheri.
[94]    The parties stipulated to Dr. Liechty's expertise as a neurosurgeon. *See* Trial Transcript; *see also* Exhibit P-5 (Curriculum Vitae of Dr. Peter Liechty).

Having resolved these fundamental factual issues, the Court proceeds to questions of liability.

## B.    Liability

### 1.    *Eymard*

#### a.    *Unseaworthiness*

A vessel owner has "'an absolute nondelegable duty to provide a seaworthy vessel' to crew members." *Fla. Fuels, Inc. v. Citgo Petroleum Corp.*, 6 F.3d 330, 332 (5th Cir. 1993) (quoting *Brister v. A.W.I. Inc.*, 946 F.2d 350, 355 (5th Cir. 1991)).  To establish a claim for unseaworthiness, "the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it is used." *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002) (quoting *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)).  In addition, "the plaintiff must establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy." *Id.*  A vessel's unseaworthiness may arise from various circumstances, including defective gear, appurtenances in disrepair, an unfit crew, an improper method of loading cargo, or an insufficient number of workers assigned to perform a shipboard task.  *See Usner v. Luckenbach*

*Overseas Corp.*, 400 U.S. 494, 499 (1971) (collecting cases).  A finding of unseaworthiness, however, cannot be based on an "isolated, personal negligent act."  *Id.* at 500.  Instead, unseaworthiness must be the result of a condition that persists for some period of time of "greater-than-instantaneous" duration.  *Kyzar v. Vale Do Ri Doce Navegacai, S.A.*, 464 F.2d 285, 290 (5th Cir. 1972).  However, "the shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability."  *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549 (1960).  Instead, "[w]hat has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence."  *Id.* at 550.

The duty of seaworthiness includes the "'fundamental duty' to provide . . . crew members with a reasonably safe means of boarding and departing from the vessel."  *Fla. Fuels*, 6 F.3d at 332 (quoting *Massey v. Williams-McWilliams, Inc.*, 414 F.2d 675, 679 (5th Cir. 1969)).  A plaintiff asserting a claim of unseaworthiness need not establish negligence, but bears the burden to show that "the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."  *Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir. 1992) (quoting *Mitchell*, 362 U.S. at 549).

The Court finds that Eymard failed to provide Badeaux with a reasonably safe means of boarding and departing from the M/V PEARL C. EYMARD.    The means of ingress that Eymard provided, and that crewmembers routinely employed,[95] was to step directly from ARTCO's spar barge onto the vessel, which was tied to the spar barge with mooring ropes.[96] To support themselves as they stepped onto the vessel, crewmembers could use one hand to grab the vessel's flagpole.  But there is no evidence of any real supports available for the other hand.  No witness at trial identified a structure other than the flagpole that a crewmember could grab when boarding the PEARL C. EYMARD.  While Keith Haydel, Jr. testified that he placed his non-flagpole hand on a "shackle" or "link" attached to the pushknee,[97] he could not identify what exactly this item was.    And photographs of the scene do not illuminate what this "shackle" or "link" might be.  Further, at trial, Haydel was impeached with testimony from his deposition, when he stated that he stepped off the boat with his hand pressed flat against the rubber exterior of the pushknee, and that he could not wrap

---

[95]   Trial Testimony of Keith Haydel, Jr.; Trial Testimony of Clifton Badeaux; Deposition of Richard Martin at 37:22-38:18; Deposition of Charles Walker at 67:18-68:11.

[96]   Trial Testimony of Keith Haydel, Jr.; Exhibit J-47 *passim* (Photographs of Accident Scene).

[97]   Trial Testimony of Keith Haydel, Jr.

his hand around this structure.[98]  Haydel admitted at trial that he did not
mention any shackle at his deposition.[99]  In any case, whatever the "shackle"
or "link" is, it is *not* a handrail or other structure designed to support
crewmembers as they board and deboard.  The Court finds that there was a
lack of adequate supports available for Eymard crewmembers getting on and
off the PEARL C. EYMARD.

Furthermore, even if a crewmember somehow supported himself with
the flagpole and another part of the pushknee, this means of ingress required
a contorted physical maneuver.  With both hands on or near the pushknee, a
crewmember has to turn his body sideways toward the pushknee, and step
to the right—*over* the gap between the spar barge and the vessel, which could
grow upwards of a foot wide, depending on river movement—and
simultaneously *up* onto the vessel, which floats higher than the spar barge.[100]
The need to traverse the vertical and lateral gap between the spar barge and
vessel only exacerbate the dangers posed by Eymard's failure to provide
adequate supports.

Moreover, the spar barge itself posed a serious slipping hazard.
Photographs of the accident scene depict a surface completely devoid of non-

---

[98]     *Id.*
[99]     *Id.*
[100]    *Id.*; Exhibit J-47 *passim* (Photographs of Accident Scene).

skid coating and the characteristic yellow paint applied with it.[101]  The lack
of non-skid where plaintiff fell is especially evident when compared to the
yellow non-skid segment visible on an adjacent portion of the spar barge—
though that section is visibly worn down as well.  Photographs show a slick,
flat, smooth surface, posing a serious slipping hazard.  And while Eymard
may not have been responsible for the maintenance of ARTCO's dock, this
was the means of ingress and egress it provided its employees.  The duty to
provide a seaworthy vessel is "absolute" and "nondelegable."  *Fla. Fuels*, 6
F.3d at 332.

Furthermore, all of these conditions clearly persisted for a "greater-
than-instantaneous" duration.  *Kyzar*, 464 F.2d at 290.  As to the method of
boarding, evidence in the record establishes that this contorted and
unsupported maneuver was the standard means of boarding and deboarding
the PEARL C. EYMARD.[102]  There was nothing instantaneous or impromptu
about this practice.  And as to the lack of non-skid on the spar barge, the
condition clearly persisted for some time.  Indeed, Badeaux himself testified

---

[101]  Exhibit J-47 *passim* (Photographs of Accident Scene).

[102]  Trial Testimony of Keith Haydel, Jr.; Trial Testimony of Clifton
Badeaux; Deposition of Richard Martin at 37:22-38:18; Deposition of
Charles Walker at 67:18-68:11.

that he had noticed the lack of non-skid on the spar barge before the evening of his accident.[103]

For these reasons, the Court finds that the M/V PEARL C. EYMARD was unseaworthy for lack of a reasonably safe means of boarding and departing from the vessel. And plaintiff has plainly established "a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy." *Boudreaux*, 280 F.3d at 468. This accident would not have happened as it did if Eymard had provided a reasonably safe means of ingress. The Court therefore finds that plaintiff prevails on his claim of unseaworthiness against Eymard.

b. *Jones Act Negligence*

Under the Jones Act, a seaman's employer is liable for damages if the employer's negligence caused the seaman's injury. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997) (en banc). The fundamental duty of a Jones Act employer is to provide his seaman employees with a reasonably safe place to work. *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989) (citing *Bobb v. Mod. Prods., Inc.*, 648 F.2d 1051, 1057 (5th Cir. 1981)). In *Gautreaux*, the Fifth Circuit clarified that an employer is liable under the Jones Act if the negligence of its employees or agents played

---

[103]    Trial Testimony of Clifton Badeaux.

"any part, even the slightest" in causing the injury or death for which damages are sought.   107 F.3d at 335 (quoting *Ferguson v. Moore-McCormack Lines, Inc.*, 352 U.S. 521, 523 (1957)).  At the same time, the employer's standard of care is not greater than that of ordinary negligence under the circumstances.  *Id.* at 338 (citations omitted).

For the reasons stated above, the Court finds that Eymard breached its duty to provide plaintiff with a reasonably safe place to work.  Plaintiff was required to traverse and board from the AB 227b in order to complete his work as a captain of the M/V PEARL C. EYMARD.[104]  And Eymard's failure to provide Badeaux with a reasonably safe place to work plainly caused his injuries.  Plaintiff therefore prevails on his claim of Jones Act negligence against Eymard.

## 2.    *ADM/ARTCO*

### a.    *Choice of Law*

To determine what law applies to the question of ADM/ARTCO's negligence, the Court must determine whether the spar barge is a vessel, governed by general maritime law, or a dock, governed by state law.  "Absent a maritime status between the parties, a dock owner's duty to crew members

---

[104]    *Id.*

27

of a vessel using the dock is defined by the application of state law, not maritime law." *Fla. Fuels*, 6 F.3d at 332 (citing *Wiper v. Great Lakes Engineering Works*, 340 F.2d 727, 730 (6th Cir.), *cert. denied*, 382 U.S. 812 (1965)); *see also Victory Carriers, Inc. v. Law*, 404 U.S. 202, 207 (1971) ("The gangplank has served as a rough dividing line between the state and maritime regimes."). The Fifth Circuit has held that piers and docks are extensions of the land. *Fla. Fuels*, 6 F.3d at 332 (citing *Victory Carriers*, 404 U.S. at 206-07). Accordingly, "[c]ourts have consistently held that [a] dock owner's only duty to the seaman arises under state law." *Landers v. Kevin Gros Offshore, LLC*, No. 08-1293, 2009 WL 5215971, at *4 (E.D. La. Dec. 29, 2009) (Lemmon, J.) (citations omitted).

To determine whether a structure is a vessel or a dock, the Court must consider "the purpose for which the craft is constructed and the business in which it is engaged." *Burchett v. Cargill, Inc.*, 48 F.3d 173, 176 (5th Cir. 1995) (quoting *Blanchard v. Engine & Gas Compressor Servs., Inc.*, 575 F.2d 1140, 1142 (5th Cir. 1978)). Floating platforms are generally not vessels when they (i) are "constructed and used primarily as . . . work platforms," (ii) are "moored or otherwise secured at the time of the accident," and when, (iii) although capable of movement across navigable waters, "any transportation

28

function they performed was merely incidental to their primary purpose." *Id.* (collecting cases).

Here, ARTCO's spar barge AB 227b meets all three criteria. At the time of the accident, it was permanently converted to a dock, and was not in navigation.[105] Further, the barge was attached to the river bottom with iron spuds.[106] While the barge is capable of lateral movement when it is not spudded to the river bottom, it was spudded in place at the time of plaintiff's incident, and could move only vertically.[107] Its ability to move was "merely incidental to [its] primary purpose." *Id.* The Court therefore finds that the spar barge, "at least while it is secured to land, is not a vessel for purposes of the Jones Act or general maritime law." *Cook v. Belden Concrete Prod., Inc.*, 472 F.2d 999, 1000-01 (5th Cir. 1973) (citing cases); *see also id.* at 1001 ("Mere flotation on water does not constitute a structure a 'vessel' for purposes of . . . warranty of seaworthiness. The elements of risk and exposure to the hazards of the sea . . . [are] absent upon floating drydocks."). The question of ARTCO/ADM's negligence arising out of the spar barge is therefore governed by Louisiana state law, not general maritime law.

---

[105]  Trial Testimony of Brent Boeckmann.

[106]  *Id.*

[107]  *Id.*; Exhibit J-41 (United States Coast Guard Vessel Information).

The Court notes that plaintiff did not explicitly bring state-law claims in his complaint, and instead lodges broad allegations of negligence against ADM and ARTCO.[108] But as ADM/ARTCO submits,[109] this Court finds that the question of ADM/ARTCO's liability is governed by two provisions of the Louisiana Civil Code: Article 2315, regarding general negligence, and Articles 2317 and 2317.1, regarding custodial liability. The Court addresses each provision in turn.

b. *General Negligence (La. Civ. Code art. 2315)*

Under Article 2315, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315(A). Louisiana courts conduct a duty-risk analysis to determine whether to impose liability under Article 2315. *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 632-33 (La. 2006). Liability requires satisfaction of five elements: (1) the defendant had a duty to conform his conduct to a specific standard; (2) the defendant's conduct failed to conform to the appropriate standard; (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries; (4) the defendant's substandard

---

[108]   R. Doc. 5 ¶ 6, 8 (Amended Complaint).

[109]   R. Doc. 96 ¶¶ B.5-B.6 (ADM/ARTCO's Proposed Findings of Fact and Conclusions of Law).

conduct was a legal cause of the plaintiff's injuries; and (5) actual damages. *Id.* at 633.

Here, Badeaux has satisfied by a preponderance of the evidence all five criteria, as to ARTCO. As to duty, under Louisiana law, the owner or operator of a dock is responsible for providing a reasonably safe dock to invitees, including employees of vessels using the dock facility. *Fla. Fuels*, 6 F.3d at 333 (citing *Sons v. New Amsterdam Cas. Co.*, 186 So. 2d 375, 376 (La. App. 4 Cir. 1966)); *Landers*, 2009 WL 5215971, at *3 (citations omitted); *Broussard v. Great Creation Shipping Ltd.*, No. 03-2171, 2004 WL 2998586, at *2 (E.D. La. Dec. 22, 2004) (Duval, J.) (citations omitted). This duty can attach to structures that are not physically part of the dock but are "furnished by the dock owner or under its control." *Fla. Fuels*, 6 F.3d at 334. Accordingly, ARTCO owed plaintiff a duty to provide a reasonably safe dock, which, for the purposes of plaintiff's work, was ARTCO's spar barge AB 227b.

As to breach, the Court finds that ARTCO "failed to conform [its conduct] to the appropriate standard," *Lemann*, 923 So. 2d at 633, and therefore breached its duty to provide a reasonably safe dock. Photographs of the scene indicate that the surface of the spar barge adjacent to the PEARL C. EYMARD was not coated with any yellow paint or non-skid material.[110]

---

[110]    Exhibit J-47 at 10-11 (Photographs of Accident Scene).

ARTCO employees testified at trial that they regularly checked for safety hazards on the spar barge, including slipping hazards.[111]  Aaron Hartman, ARTCO's barge maintenance manager, testified that he had no particular maintenance schedule for the AB 227b, but that he generally reapplied the spar barge's paint and non-skid about once a year, generally in June and July.[112]  At trial, when asked when the spar barge was last pressure-washed, painted, and coated with non-skid, Hartman stated that the entire deck "would have been" painted in the summer of 2018,[113] six months' before plaintiff's accident.[114]  But there is no evidence that the spar barge was in fact re-coated in the summer of 2018, and Hartman stopped short of saying that he definitely knows that it was re-coated then.   And contemporaneous photographs further belie this version of events.  Though Hartman testified that the yearly process entailed re-coating the *entire length* of the spar barge, photographs taken on the evening of plaintiff's accident demonstrate that the adjacent portion of the deck has yellow paint and non-skid still visible, while the portion where plaintiff slipped is completely devoid of paint and non-

---

[111]   Trial Testimony of Aaron Hartman; Trial Testimony of Jacob Vega; Trial Testimony of Brent Boeckmann.

[112]   Trial Testimony of Aaron Hartman.

[113]   *Id.*

[114]   *Id.*

skid.[115]  Indeed, there is evidently a line dividing the yellow portion from the non-yellow portion.[116]  The photographs are consistent with ARTCO's having re-coated part of the spar barge at one time, but not the adjacent portion where plaintiff ultimately slipped.  And in any case, even if ARTCO did paint the portion of the spar barge where plaintiff slipped as recently as the summer of 2018, that maintenance was facially inadequate.  As discussed, the surface beneath plaintiff is unpainted, and is flat and slick—an obvious slipping hazard.  The Court finds that ARTCO's non-maintenance of the spar barge AB 227b constitutes a breach of its duty to provide a reasonably safe dock.

Badeaux has also satisfied the elements of causation and damages. ARTCO's "substandard conduct was a cause in fact of [his] injuries," *id.*, because he would not have slipped, fallen, and injured his back if the surface of the spar barge where he attempted to board the PEARL were properly maintained to prevent slips.  ARTCO's substandard conduct was also the legal cause of plaintiff's injuries. *See id.*  This inquiry asks whether the scope of the relevant duty "extends to or is intended to protect *this plaintiff* from *this type of harm* arising in *this manner*."  *Roberts v. Benoit*, 605 So. 2d

---

[115]    Exhibit J-47 at 10-11 (Photographs of Accident Scene).
[116]    *Id.*

1032, 1044-45 (La. 1991) (citations omitted).  The duty to maintain a walking surface that is free of slipping hazards is plainly intended to protect crewmembers using the spar barge from slipping and falling.  Plaintiff has therefore shown legal cause.  Finally, plaintiff has shown actual damages arising from ARTCO's breach.  His damages are addressed elsewhere in this order.

For these reasons, the Court finds that plaintiff has shown by a preponderance of evidence that ARTCO is liable as a matter of general negligence under Louisiana Civil Code Article 2315.

> c. *Custodial Liability (La. Civ. Code arts. 2317, 2317.1)*

Articles 2317 and 2317.1 of the Louisiana Civil Code govern custodial liability.  The former provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."  La. Civ. Code art. 2317.  Article 2317.1 qualifies this liability, providing that "[t]he owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage. . . ."  La. Civ. Code art. 2317.1.  To recover under Articles 2317 and 2317.1, a plaintiff must establish four elements: (1)

the thing that caused his damage was in the defendant's custody; (2) the thing had a defect or condition creating an unreasonable risk of harm; (3) the defective condition caused plaintiff's injuries; and (4) the defendant knew or should have known of the defect that caused his injuries. *Cormier v. Dolgencorp, Inc.*, 136 F. App'x 627, 627-28 (5th Cir. 2005) (citing La. Civ. Code arts. 2317, 2317.1); *Luquette v. Great Lakes Reinsurance (UK) PLC*, 209 So. 3d 342, 348 (La. App. 5 Cir. 2016), *writ denied*, 216 So. 3d 806 (La. 2017); *Hebert v. Sw. La. Elec. Membership Corp.*, 667 So. 2d 1148, 1157 (La. App. 3 Cir. 1995) (citing *Oster v. Dep't of Transp. & Dev.*, 582 So. 2d 1285 (La. 1991)).

Here, plaintiff has satisfied by a preponderance of the evidence all four elements, as to ARTCO.  First, it is undisputed that the spar barge AB 227b was in defendant ARTCO's custody.  ADM/ARTCO own and operate the spar barge AB 227b, and ARTCO employees are responsible for its maintenance.[117]

Second, the lack of non-skid on the spar barge amounts to a defect creating an unreasonable risk of harm.  Under Louisiana law, whether a defect presents an unreasonable risk of harm is an "issue of mixed fact and

---

[117]    Trial Testimony of Brent Boeckmann; Trial Testimony of Aaron Hartman; Trial Testimony of Jacob Vega.

law or policy that is peculiarly a question for the jury or trier of the facts." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 617 (5th Cir. 2018) (quoting *Broussard v. State ex rel. Off. Of State Bldgs.*, 113 So. 3d 175, 183 (La. 2013)).  To make this determination, the Court must "balance the gravity and risk of harm against individual societal rights and obligations, the social utility of the thing, and the cost and feasibility of repair." *Broussard*, 113 So. 3d at 184 (citing *Reed v. Wal-Mart Stores, Inc.*, 708 So. 2d 362, 365 (La. 1998)).  Specifically, the Court must consider four factors: "(1) the utility of the complained-of condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature."  *Id.* (citations omitted).

As to the first factor, utility of the condition, the Court notes that Louisiana jurisprudence is inconsistent on the proper scope of this inquiry— namely, whether the Court must examine the utility of the defect itself, or "the thing as a whole, notwithstanding the presence of the defect." *Pryor v. Iberia Par. Sch. Bd.*, 60 So. 3d 594, 597 (La. 2011) (collecting cases). *Compare, e.g.*, *Boyle v. Bd. of Supervisors, La. State Univ.*, 685 So. 2d 1080, 1083 (La. 1997) ("The utility of sidewalks on university campuses is clear."),

*with Reed*, 708 So. 2d at 365 (finding that "expansion joints," the hazard on which plaintiff tripped, "are necessary for safety and for maintenance of larger paved surfaces"). Despite the occasionally broadened scope of the question, the Louisiana Supreme Court stated in *Reed v. Wal-Mart Stores* that "[t]he trier of fact must decide whether the social value and utility *of the hazard* outweigh, and thus justify, its potential harm to others." *Reed*, 708 So. 2d at 365 (emphasis added). Similarly, in *Broussard*, the court instructed factfinders to consider "the utility *of the complained-of condition*." *Broussard*, 113 So. 3d at 184 (emphasis added).

This Court thus relies on the plain language of *Reed* and *Broussard*, as well as the logic of the risk-utility analysis. This balancing test seeks to determine whether a particular *hazard's* utility outweighs its risks. Indeed, the risk-utility framework is intended to aid courts in evaluating the second element of custodial liability: whether "the thing contained a vice or defect which presented an unreasonable risk of harm to others." *Cormier*, 136 F. App'x at 627-28. The object of the analysis is thus the "vice or defect," not "the thing."

As applied here, the "thing" is the spar barge AB 227b, and the "vice or defect" is the lack of non-skid on the portion of the spar barge where plaintiff slipped. Accordingly, the Court must determine whether the lack of non-skid

presented an unreasonable risk of harm. Therefore, the relevant "complained-of condition" is the lack of non-skid.

Having determined the scope of the inquiry, the Court finds that the lack of non-skid has no utility whatsoever. The first factor thus favors a finding that the defect presented an unreasonable risk of harm.

The second factor is the "likelihood and magnitude of harm, including the obviousness and apparentness of the condition." *Broussard*, 113 So. 3d at 184. The Louisiana Supreme Court has explained that, "[i]n order for a defect to be considered open and obvious, the danger created by that defect must be apparent to all comers." *Id*. at 192. This inquiry focuses on objective obviousness. It "may not incorporate the plaintiff's subjective knowledge of the defect or 'awareness of the risk' because doing so would undermine Louisiana's comparative fault regime." *Renwick*, 901 F.3d at 617 (citing *Broussard*, 113 So. 3d at 189); *see also Rodrigue v. Baton Rouge River Ctr*., 209 So. 3d 93, 93 (La. 2017), ("To the extent plaintiff was aware of the condition of the stairwell, the trier of fact may consider such evidence at trial for purposes of determining the percentage of fault, if any, to be assigned to plaintiff."). Here, the Court finds that the lack of non-skid on the spar barge would not be apparent to all comers. While its slippery and dangerous condition is apparent to the Court at trial, and certainly should have been

apparent to ARTCO personnel who oversaw maintenance of the spar barge, the Court finds that it is not so obvious as to be "readily apparent and observable to anyone" who encounters it. *Pitre v. La. Tech Univ.*, 673 So. 2d 585, 592 (La. 1996). The absence of non-skid does not belong the category of blatant hazards including, for instance, light poles towering over a parking lot where students are sledding, *see id.* at 591-92, an 18-inch gap between wooden seat boards on a set of bleachers, *see Pryor*, 60 So. 3d at 598, or even a pothole in a road, *see Dauzat v. Curnest Guillot Logging Inc.*, 995 So. 2d 1184, 1187 (La. 2008). The Court finds that the lack of non-skid on the spar barge created a high likelihood of harm. The second factor thus favors a finding that the condition posed an unreasonable risk of harm.

So too does the third factor, the cost of preventing the harm. *Broussard*, 113 So. 3d at 184. The Court finds that applying paint and non-skid to the spar barge would not have been unreasonably expensive. While the record contains no evidence of the cost of this process, ARTCO's barge maintenance manager, Aaron Hartman, testified that re-coating is a yearly routine.[118] The Court finds that this act of maintenance on the AB 227b was financially feasible. *Compare Chambers v. Vill. of Moreauville*, 85 So. 3d 593, 600 (La. 2012) ("The cost to Moreauville to fix all sidewalk deviations

---

[118]    Trial Testimony of Aaron Hartman.

of one-and-one-fourth to one-and-one-half inches would . . . be substantial."). The third factor supports a finding that the lack of non-skid presented an unreasonable risk of harm.

Fourth and finally, the Court considers "the nature of the plaintiff's activities in terms of its social utility or whether it is dangerous by nature." *Id.* Here, on the one hand, Badeaux's activities as a captain of the PEARL were socially useful. The vessel was engaged by contract "in the movement of barges primarily in the vicinity of [ADM's] export facility."[119] But on the other hand, the duties of plaintiff's job, including the process of boarding and deboarding the vessel, carry many physical risks, and could be said to be "dangerous by nature." *Cf. Dauzat*, 995 So. 2d at 1187 ("[T]he job of a logging truck driver is dangerous by nature, as such drivers frequently encounter poor road conditions."). Because these two considerations cut opposite ways, the fourth factor does not aid the Court in determining whether the lack of non-skid posed an unreasonable risk of harm.

Having balanced the risks posed by the lack of non-skid against the utility offered by the lack of non-skid, the Court finds that the risks of the condition far outweigh its utility. Accordingly, the lack of non-skid on

---

[119]    Exhibit J-3 at 1 (Time Charter Agreement).

ARTCO's spar barge AB 277b created an unreasonable risk of harm. *See Cormier*, 136 F. App'x at 627-28; *Broussard*, 113 So. 3d at 193.

As to the remaining two elements of custodial liability, those too are satisfied. As discussed, the lack of non-skid on the surface of the spar barge caused plaintiff's fall, and his resulting injuries. *See* La. Civ. Code arts. 2317 & 2317.1. And finally, ARTCO knew or should have known of this defect on the spar barge. *See* La. Civ. Code art. 2317.1. The lack of non-skid where plaintiff slipped is plainly visible in the contemporaneous photographs.[120] And logic dictates that this condition—purportedly a result of wear and tear[121]—does not come to exist overnight. Wear and tear, by definition, takes time, so ARTCO had ample time and opportunity to notice the condition. Indeed, plaintiff testified that he noticed the lack of non-skid before the evening of his accident.[122] If plaintiff knew of the defect, then ARTCO similarly knew, or should have known, of it. In fact, Jacob Vega testified that at least one ARTCO vessel uses the AB 227b,[123] and that he has walked on the

---

[120]   Exhibit J-47 at 10-11 (Photographs of Accident Scene).
[121]   Trial Testimony of Aaron Hartman.
[122]   Trial Testimony of Clifton Badeaux.
[123]   Vega testified that, when he responded to plaintiff's accident, he sought help from crewmembers on ARTCO's vessel, the LOUISIANA PARADISE. He said that the LOUISIANA PARADISE was moored on the same barge as plaintiff, slightly upriver of the incident. *See* Trial Testimony of Jacob Vega.

spar barge many times before.[124]   Furthermore, the lack of non-skid is particularly apparent compared to ARTCO's "home base" barge, which is painted with bright yellow stripes visible from many yards away.[125]   ARTCO employees traversed this "home base" barge very frequently, and it is repainted more often than the spar barge AB 227b.[126]   These circumstances collectively indicate, by a preponderance of the evidence, that ARTCO knew or should have known of the lack of non-skid on the segment of the spar barge AB 227b where plaintiff slipped.   For these reasons, the Court finds that ARTCO is liable for plaintiff's injuries as a matter of custodial liability, under Articles 2317 and 2317.1 of the Louisiana Civil Code.

The Court finds no liability for ADM, the parent company of ARTCO. No party has introduced evidence indicating that ADM, rather than ARTCO, breached any duty to plaintiff under Louisiana law, or that ADM, rather than ARTCO, knew or should have known of the defect causing plaintiff's injuries. The Court therefore assigns the entirety of ADM/ARTCO's fault to ARTCO.

---

[124]   *Id.*
[125]   Exhibit J-47 at 12 (Photograph of Home Base Barge).
[126]   Trial Testimony of Aaron Hartman.

### 3.    *Clifton Badeaux*

Plaintiff's contributory negligence affects his recovery under all of the above-discussed theories of liability.  Under the Jones Act and the law of unseaworthiness, a seaman's contributory negligence diminishes his recovery in proportion his fault.  *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 302 (5th Cir. 2008) (citing 45 U.S.C. § 53); *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 327 (5th Cir.), *reh'g denied* (May 22, 2020).  To establish that a seaman is contributorily negligent, an employer must prove negligence and causation.  *Johnson*, 544 F.3d at 302 (citations omitted).  The seaman's duty of care is not a "slight" duty of care to protect himself from the employer's negligence.  *Gautreaux*, 107 F.3d at 339.  Rather, the seaman is also obliged to act "with ordinary prudence under the circumstances," which include the seaman's reliance on his employer to provide a safe working environment and the seaman's own experience, training, and education.  *Id.*

Contributory negligence also diminishes a plaintiff's recovery for negligence claims under Louisiana tort law.  Article 2323 of the Louisiana Civil Code provides that, "[i]f a person suffers injury, death, or loss as the result partly of his own negligence . . . , the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss."  La. Civ. Code

2323. Under Louisiana law, comparative negligence is a factual determination based on "the reasonableness of the party's behavior under the circumstances." *State Farm Mut. Auto. Ins. Co. v. McCabe*, 150 So. 3d 595, 599 (La. App. 3 Cir. 2014) (quoting *Khaled v. Windham*, 657 So. 2d 672, 676 (La. App. 1 Cir. 1995)).

Here, the Court finds that plaintiff was contributorily negligent in multiple ways. First, the soles of plaintiff's boots were heavily worn.[127] Two months before his accident, Badeaux signed an Eymard policy listing "Captain Responsibilities," which required him to "wear steel toe, low quarter oil resistant sole shoes at all times while on vessels[,] deck[,] and on barges."[128] And he agreed at trial that an important rule for captains on the Lower Mississippi River is not to let shoes fall into disrepair.[129] Plaintiff's failure to replace his shoes, and his decision to walk in the rain on the spar barge while wearing the worn-down shoes, do not reflect "ordinary prudence under the circumstances." *Gautreaux*, 107 F.3d at 339; *see State Farm*, 150 So. 3d at 599.

---

[127] Exhibit A-2 (Plaintiff's Boots).

[128] Exhibit J-1 at 23 (Eymard Bros. Towing Co. Captain's Responsibilities, signed by Clifton Badeaux on November 2, 2018).

[129] Trial Testimony of Clifton Badeaux.

Eymard's Captain Responsibilities also required plaintiff to "use good judgment, and pay attention," to "inform [the] office of any unsafe conditions or acts which may occur on the job;" to "inspect tools[] and equipment frequently[; and] take prompt action to replace or repair faulty or defective equipment."[130] On the same day that Captain Badeaux signed this document, he also signed a list of rules from Eymard's safety orientation, which provided that the captain's "safety responsibilities" include that he must "exercise close supervision over work," and "inspect tools, apparatus and equipment frequently."[131] Badeaux failed to adhere to these responsibilities. He testified that he noticed before the date of his accident that ARTCO's spar barge AB 227b lacked non-skid coating.[132] He admits that he never reported the condition to anyone.[133] While he claims that he feared adverse employment consequences for reporting the safety issue,[134] the Court finds no evidence to support such a fear. Plaintiff testified that he did not know whether ARTCO had ever retaliated against an Eymard employee for

---

[130]   Exhibit J-1 at 23-24 (Eymard Bros. Towing Co. Captain's Responsibilities).

[131]   *Id.* at 8 (Eymard Bros. Towing Co. Safety Orientation Program, signed by Clifton Badeaux on November 2, 2018).

[132]   Trial Testimony of Clifton Badeaux.

[133]   *Id.*

[134]   *Id.*

reporting a safety hazard,[135] and there is no evidence in the record that any employee, at Eymard or ARTCO, had ever been fired or otherwise punished for reporting safety concerns. Badeaux's awareness of the lack of non-skid on the spar barge, and his failure to report it or seek to have it remedied, based on his sound judgment, industry experience, and explicit company policy, was neither responsible nor prudent under the circumstances. *See Gautreaux*, 107 F.3d at 339; *State Farm*, 150 So. 3d at 599.

Finally, Badeaux admitted that he was trained by prior employers always to maintain three points of contact with surrounding structures and surfaces when boarding and deboarding vessels, to avoid slips and falls.[136] At the time of the accident, Badeaux had twenty years of experience as a riverboat captain, and an additional six years as a deckhand.[137] At trial, he agreed that he had been taught about the three-points-of-contact rule for these 26 years.[138] It is undisputed that, when boarding the vessel on the evening of his fall, plaintiff did not maintain three points of contact. Instead, he boarded with only his left hand on the vessel's flagpole, and his right foot on the surface of the spar barge.[139] His right hand was occupied, holding his

---

[135]     *Id.*
[136]     *Id.*
[137]     *Id.*
[138]     *Id.*
[139]     *Id.*

burger bag.  And while it is true that the PEARL lacked a reliable handrail for his right hand, Badeaux could have steadied himself by placing his hand against the rubber exterior of the pushknee.  He did not do this.  Indeed, plaintiff did not contend at trial that he had nowhere to place his right hand. He instead testified that the reason he boarded as he did was in order to hold his burger bag in his hand, as it did not fit in the larger bag over his shoulder.[140]   Badeaux's failure to maintain three points of contact—an established safety rule intended precisely to prevent falls—does not reflect ordinary prudence or responsible decision-making under the circumstances. *See Gautreaux*, 107 F.3d at 339; *State Farm*, 150 So. 3d at 599.

For all of these reasons, the Court finds that Badeaux bears significant responsibility for his accident.

### 4.    *Apportionment of Fault*

Under the Jones Act and the law of unseaworthiness, a seaman's contributory negligence diminishes his recovery in proportion his fault. *Johnson*, 544 F.3d at 302 (citing 45 U.S.C. § 53); 956 F.3d at 327.  Based on the foregoing considerations regarding plaintiff's contributory negligence, the Court apportions 50% of fault to the plaintiff.  *See, e.g.*, *Boudreaux*, 280

---

[140]    *Id.*

F.3d at 467 n.3, 469 (affirming the district court's finding of 50% contributory negligence by a seaman who "participat[ed] in [a] risky maneuver").

Defendants Eymard and ARTCO therefore collectively bear the remaining 50% of fault. Eymard's liability is governed by the Jones Act and general maritime law, under which joint tortfeasors are jointly and severally liable for the plaintiff's damages. *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1116 (5th Cir. 1995) (en banc). In maritime personal-injury cases, the Court allocates liability for damages among the parties in proportion to their comparative degree of fault. *Loose v. Offshore Nav., Inc.*, 670 F.2d 493, 500-02 (5th Cir. 1982); *cf. United States v. Reliable Transfer Co.*, 421 U.S. 397, 411 (1975) (holding, in a Jones Act collision case, that "liability for . . . damage is to be allocated among the parties proportionately to the comparative degree of their fault."). ARTCO's obligation is governed by Louisiana law. Louisiana law provides that "[a] joint tortfeasor shall not be liable for more than his degree of fault[,] and shall not be solidarily liable with any other person for damages attributable to the fault of such other person . . . ." La. Civ. Code art. 2323(B).

Based on the foregoing considerations as to liability, the Court apportions 25% of fault to Eymard, and 25% of fault to ARTCO.

### C.    Maintenance and Cure

The duty of maintenance and cure obligates a maritime employer to pay for the lost wages, medical care, food, lodging, and other incidental expenses of a mariner who falls ill or is injured while in the service of a vessel. *See Aguilar v. Standard Oil Co. of N.J.*, 318 U.S. 724, 730 (1943); *The Osceola*, 189 U.S. 158, 175 (1903). The duty is practically absolute. Unlike an employer's duties under the Jones Act, liability for maintenance and cure is not predicated on fault or negligence. *Aguilar*, 318 U.S. at 730. Because the duty is so broad, maintenance and cure has been compared to mandatory employer-provided health and accident insurance. *See Lindquist v. Dilkes*, 127 F.2d 21, 24 (3d Cir. 1942) ("Both the shipowner and the insurer assume an obligation whose burden may depend upon the physical condition of the assured and the seaman. The company gets a cash consideration; the shipowner only a contented mariner."); G. Gilmore & C. Black, The Law of Admiralty 281-82 (2d ed. 1975).

In keeping with the absolute nature of the right, a plaintiff's burden of proof on a maintenance and cure claim is slight: he need establish only that he was injured or became ill while "subject to the call of duty as a seaman." *Aguilar*, 318 U.S. at 732; *see also* 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6:28 (6th ed. 2020).

49

Generally, the maritime employer's obligation to provide maintenance and cure ends when a doctor provides a qualified medical opinion that plaintiff has reached maximum medical improvement ("MMI"). *See Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir. 1987) (citations omitted) (explaining that the right to maintenance and cure terminates when the seaman reaches maximum medical recovery, as defined by a "medical, not . . . judicial, determination of permanency"). A seaman reaches MMI when it appears "probable that further treatment will result in no betterment in the claimant's condition." *Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir. 1996) (citations omitted). "[A]mbiguities or doubts in the application of the law of maintenance and cure are resolved in favor of the seaman." *Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 374 n.2 (5th Cir. 1981) (citing *Liner v. J.B. Talley & Co.*, 618 F.2d 327, 332 (5th Cir. 1980)).

It is undisputed here that plaintiff is entitled to maintenance and cure arising out of his accident. To date, Eymard has paid plaintiff maintenance totaling $55,055.00, and cure totaling $178,492.25.[141] As already noted, the Court finds that plaintiff's spinal fusion and augmentation, as well as the hardware-removal procedure, were medically necessary. Dr. Liechty

---

[141]   Exhibit J-38 at 3-6 (Eymard Record of Payments to Badeaux for Maintenance and Cure).

testified at trial that plaintiff reached MMI in mid-June of 2021.[142]  The Court credits this MMI date.  The alternative medical opinions as to the timing of plaintiff's MMI are unpersuasive.  For instance, Dr. Pourtaheri released plaintiff to return to work in September of 2019, but, as established, plaintiff continued to require treatment as of that date.  It cannot be said that in September of 2019 it was "probable that further treatment [would] result in no betterment in the claimant's condition."  *Rashidi*, 96 F.3d at 128.  Dr. Robert opined on November 8, 2019 that plaintiff "should be at MMI a year after his treatment with kyphoplasty,"[143] *i.e.*, July 22, 2020.  But this opinion predated the projected MMI by nearly nine months.  And when July 22, 2020 arrived, plaintiff had titanium hardware in his back that would later require removal.  Again, then, it was not probable on July 22, 2020 that "further treatment [would] result in no betterment in the claimant's condition."  *Id.* Further, the Court is to construe ambiguities as to maintenance and cure in favor of the seaman.  *Gaspard*, 649 F.2d at 374 n.2.  For these reasons, the Court credits Dr. Liechty's opinion, and determines that plaintiff reached MMI on June 17, 2021.  Plaintiff is entitled to maintenance and cure through this date.

---

[142]    Trial Testimony of Dr. Peter Liechty.
[143]    Exhibit J-6 at 3 (Robert Report).

Records indicate that, after June 17, 2021, Eymard tendered three maintenance payments to Badeaux, totaling $5,060.00.[144]   Eymard is therefore entitled to a credit of $5,060.00. *See Breese*, 823 F.2d at 104.

Records further indicate that Eymard tendered multiple cure payments for services rendered after June 17, 2021.  Calculating the total of post-MMI payments for cure is more difficult than that for maintenance, and the Court thus undertakes to explain its methodology.  As an initial matter, the Court finds that one significant payment bears a date containing a typographical error.  Eymard's records include a July 19-22, 2021 payment of $13,251.17 for services at Terrebonne General Medical Center.[145]  But plaintiff's visit to Terrebonne General was in 2019, and records from the hospital indicate that it received $13,251.17 in payments for ER services dated July 19-22, 2019.[146]  The Court finds that this discrepancy reflects a typographical error.  The payment to Terrebonne General should be dated July 2019, not July 2021.  This payment is therefore properly included as pre-MMI cure, and thereby *excluded* from any credit owed to Eymard.

---

[144]   Exhibit J-38 at 3 (Eymard Record of Badeaux's Maintenance Payments) (indicating payments on July 14, August 4, and September 22, 2021, in the amounts of $1,705.00, $1,705.00, and $1,650.00, respectively).

[145]   *Id.* at 6 (Eymard Record of Badeaux's Cure Payments).

[146]   Exhibit J-29 at 15 (Terrebonne General Medical Center Records).

Next, the Court notes that two of Eymard's itemized cure payments correspond to service dates that span from before MMI to after MMI. The Court must therefore determine which portion of these cure payments corresponds to pre-MMI services, and which portion corresponds to post-MMI services. First, a $975.00 payment to the One Spine Institute covers services rendered on three distinct dates, one of which is August 24, 2021.[147] Records from One Spine confirm that plaintiff visited Dr. Liechty at One Spine on this day.[148] The $975.00 is not allocated among the three visits, but, for other visits to Dr. Liechty during this period—namely, on June 22, July 27, and September 21, 2021—Eymard paid $325.00 per visit.[149] This figure also represents approximately one-third of the $975.00 payment. For these reasons, the Court assigns a sum of $325.00 to the August 24, 2021 visit to One Spine. This cure payment postdates plaintiff's MMI, and is therefore owed to Eymard as a credit.

Second, a $1,375.00 payment to Physiofit PT covers service dates ranging from June 8, 2021 to June 29, 2021.[150] Plaintiff's MMI date falls in the middle of this range. Records from Physiofit indicate that plaintiff

---

[147]   Exhibit J-38 at 6 (Eymard Record of Badeaux's Cure Payments).
[148]   Exhibit P-2 at 58 (Letter from Dr. Liechty to Kristi Post) (stating, "I saw Clifton Badeaux on 8/24/2021.").
[149]   Exhibit J-38 at 5 (Eymard Record of Badeaux's Cure Payments).
[150]   *Id.* at 6.

attended physical therapy at Physiofit seven times during this period: four times on or before June 17, and three times after June 17.[151]  For all seven visits combined, Physiofit charged a total of $2,358.00,[152] and Eymard paid a total of $1,375.00 in cure.[153]  The $1,375.00 figure is not itemized or otherwise allocated among the seven visits.  But for the three visits that postdate June 17, Physiofit *charged* a total of $957.50.[154]  The Court therefore calculates Eymard's post-MMI cure contribution by applying the proportion of the *total* charges that Eymard paid for this period, to the total charges for Badeaux's three post-MMI visits.  To that end: $1,375.00 is 58.3 percent of $2,358.00.  And 58.3 percent of $957.50 is $558.34.  The Court therefore finds that plaintiff received $558.34 in post-MMI cure payments for his three visits to Physiofit after June 17, 2021.  This amount is owed to Eymard as a credit.

---

[151]   Exhibit J-27 at 253-54 (Physiofit Patient Records).
[152]   *Id.*; Exhibit J-38 at 6 (Eymard Record of Badeaux's Cure Payments).
[153]   Exhibit J-38 at 6 (Eymard Record of Badeaux's Cure Payments).
[154]   Exhibit J-27 at 254 (Physiofit Patient Records) (reflecting the sum of charges for treatment provided on June 22, June 24, and June 29, 2021).

Finally, some of Eymard's itemized cure payments plainly postdate June 17, 2021. This set of payments totals $3,229.35.[155] Plaintiff owes Eymard a credit for these post-MMI cure payments.

Based on the foregoing calculations, the Court finds that Eymard paid Badeaux a total of $4,112.69 for medical services rendered after he reached MMI on June 17, 2021. Eymard is therefore entitled to a credit of $4,112.69. *See id.*

## II.   PLAINTIFF'S DAMAGES

Under the Jones Act, a plaintiff may recover all of his pecuniary losses. *Cruz v. Hendy Int'l Co.*, 638 F.2d 719, 723 (5th Cir. 1981). Pecuniary loss may include loss of earning capacity, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness. *Daigle v. L & L Marine Transp. Co.*, 322 F. Supp. 2d 717, 730 (E.D. La. 2004) (citing Thomas J. Schoenbaum, Admiralty and Maritime

---

[155]   Exhibit J-38 at 4-6 (Eymard Record of Badeaux's Cure Payments) (indicating payments of: $431.48 for service on October 1, 2021, $146.01 for service on July 1, 2021, $188.71 for service on July 8, 2021, $35.53 for service on August 1, 2021, $354.14 for service on August 8, 2021, $431.48 for service on September 8, 2021, $325.00 for service on June 22, 2021, $325.00 for service on July 27, 2021, $325.00 for service on September 21, 2021, and $667.00 for service from July 1 to July 8, 2021).

Law § 5:15, at 234).  The Fifth Circuit has explained that, "although Jones Act negligence and unseaworthiness under general maritime law are two distinct causes of action, they largely provide for the same remedies." *Luwisch*, 956 F.3d at 327 (cleaned up) (citations omitted).  Plaintiff is also entitled to recover damages from ARTCO, based on its state-law negligence.  *See* La. Civ Code. arts. 2315, 2317 & 2317.1.

The parties have stipulated to the admission of two expert economic reports, one from Dr. G. Randolph Rice (plaintiff's expert)[156] and one from Dr. Kenneth J. Boudreaux (defendants' expert).[157]  They have also stipulated to the admission of two vocational-rehabilitation expert reports, one from Dr. Larry Stokes (plaintiff's expert),[158] and one from Nancy Favaloro (defendants' expert).[159]  Based on this evidence and the evidence presented at trial, the Court makes the following findings as to Badeaux's damages.

---

[156]    Exhibit J-10 at 1-7 (Rice Report).

[157]    Exhibit J-7 at 1-9 (Boudreaux Report).

[158]    Exhibit J-9 at 1-13 (Stokes Report).

[159]    Exhibit J-8 at 1-7 (Favaloro Report).

## A.    Lost Wages

### 1.    *Past Lost Wages*

Badeaux is entitled to any wages that he would have earned had he continued to work as a riverboat captain through the date of trial, less (1) any wages that Eymard paid him, and (2) any wages that he could have earned despite his physical condition.  *See Eugene v. Mormac Marine Transp., Inc.*, 48 F.3d 529, at *4 (5th Cir. 1995) (unpublished opinion) (finding appropriate an award for past lost wages up to the point at which defendant could return to work); *Daigle*, 322 F. Supp. 2d at 731 (subtracting amounts earned after plaintiff's injury from his past loss); *In re Diamond B Marine Servs., Inc.*, No. 99-951, 2001 WL 1164914, at *18 (E.D. La. Sept. 28, 2001) (noting that allowing recovery for wages paid by plaintiff's employer would amount to "double recovery"); *Crum v. United States*, No. 99-2178, 2000 WL 943253, at *3 (E.D. La. July 6, 2000) (finding that where an injury did not prevent the plaintiff from returning to work, he was not entitled to past wages).  In the maritime context, an award for lost wages must be based on after-tax earnings.  *See Myers v. Griffin-Alexander Drilling Co.*, 910 F.2d 1252, 1256 (5th Cir. 1990) (citing *Hernandez v. M/V RAJAAN*, 841 F.2d 582, 587 (5th Cir. 1988)).

Both Dr. Rice and Dr. Boudreaux submit calculations of plaintiff's past lost wages. Accounting for the $84,475.00 in wages that Eymard actually paid plaintiff in 2019,[160] Dr. Rice estimates that plaintiff suffered an after-tax wage loss of $224,185.00 as a result of his accident.[161] Dr. Rice does not state any assumption regarding plaintiff's ability to return to work, *i.e.*, the wages that he could have earned despite his injuries. *See Eugene*, 48 F.3d at *4. For this reason, the Court finds that Dr. Rice's brief analysis and calculation are not persuasive.

The Court instead credits the calculations of Dr. Boudreaux, who submits a more thorough analysis as to past wage loss. Importantly, Dr. Boudreaux calculates multiple possible outcomes based on various scenarios regarding plaintiff's return to work, and the wages he would earn upon return.[162] Dr. Boudreaux begins by relying on income data provided by plaintiff's vocational-rehabilitation expert, Dr. Larry Stokes. Dr. Boudreaux calculates that plaintiff's pre-injury earnings were $112,741.30 per year, based on his average income between 2016 and 2018.[163] He then deducts the $84,475.00 actually paid by Eymard, and lays out seven distinct scenarios,

---

[160]   Exhibit J-38 at 2 (Eymard Wages Paid to Clifton Badeaux).
[161]   Exhibit J-10 at 2 (Rice Report).
[162]   Exhibit J-7 at 4, 9 (Boudreaux Report).
[163]   *Id.* at 3.

based on two variables: the date when plaintiff could have returned to work, and the wages that plaintiff could have earned from that job.[164]

As to plaintiff's return-to-work date, Dr. Boudreaux submits calculations based on return dates of (i) September 10, 2019, *i.e.*, the day that Dr. Pourtaheri released him to work; (ii) January 17, 2021, *i.e.*, one month after his hardware removal, and (iii) June 17, 2021, *i.e.*, the approximate date when Dr. Liechty said that plaintiff reached MMI.[165]  And while plaintiff's injuries precluded his return to work as a riverboat captain, both plaintiff's and defendants' vocational-rehabilitation experts state in their reports that plaintiff can work in a sedentary or non-physically-demanding capacity.[166] Based on the evidence in the record and the testimony presented at trial, the Court finds that plaintiff could have offset his wage loss by returning to work on June 17, 2021, the date he reached MMI.

Dr. Stokes, plaintiff's vocational-rehabilitation expert, estimated that the sedentary work alternatives available to plaintiff pay an average starting

---

[164]    *Id.* at 9.

[165]    *Id.*

[166]    Exhibit J-8 at 7 (Favaloro Report) ("In the event that Clifton Badeaux is restricted in returning to work at jobs that have tasks consistent with the Light and/or Light-Medium physical demand levels, it is my opinion[] that he would be employable at jobs such as those noted in this report."); Exhibit J-9 at 9 (Stokes Report) (noting that "Dr. Liechty opined that Mr. Badeaux is permanently disabled and is restricted to no greater than sedentary work following his recovery.").

rate of $21,440.00 per year.[167]  The Court therefore assumes that plaintiff could have returned to work on June 17, 2021, and earned $21,440.00 per year.  This corresponds to Dr. Boudreaux's scenario number 6,[168] which is based on post-tax earnings.[169]

Accounting for plaintiff's pre-injury earning capacity of $112,741.30, and subtracting (i) $84,475.00 in advance wages paid by Eymard, and (ii) the amount that plaintiff could have earned had he returned to work on June 17, 2021, at a rate of $21,440.00 per year, s*ee Eugene*, 48 F.3d at *4, plaintiff is entitled to past lost wages totaling $174,235.57.[170]

### 2.  *Future Lost Wages*

The Fifth Circuit established the method for calculating future lost wages in maritime cases in *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983).  In that case, the court set forth a four-step process for determining lost wages as follows: (1) estimate the loss of work life or expected remaining work-life of the plaintiff; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount that total to present value.  *Id.*

---

[167]  Exhibit J-9 at 10 (Stokes Report) (reporting two alternative sedentary occupations, with starting wages of $21,210.00 and $21,670.00).

[168]  Exhibit J-7 at 9 (Boudreaux Report).

[169]  *Id.* at 5-6.

[170]  *Id.* at 9 (scenario no. 6).

at 117. Any award for future lost wages in the maritime context must be based on after-tax earnings. *Hernandez*, 841 F.2d at 587 (stating that in calculating future lost earnings, "the fact-finder should subtract amounts that the wage earner would have been required to pay, such as income tax and work expenses" (quoting *Culver*, 722 F.2d at 117)).

As to loss of work life, plaintiff's wife testified that plaintiff intended to work as a boat captain until approximately age "70 or 72."[171] The Court finds this testimony self-serving and not credible, in light of the physical demands of the job, and that age 70 or 72 far exceeds Captain Badeaux's work-life expectancy. The Court instead credits Dr. Boudreaux's calculation that, at the time of trial, plaintiff had a work-life expectancy of 11.43 years.[172] This figure reflects the average number of years that individuals comparable to plaintiff would be expected to be in the labor force.[173] *See Luwisch*, 956 F.3d at 329 ("A damages award for future lost wages should generally be based upon a seaman's work-life expectancy, meaning 'the average number of years that a person of a certain age will both live and work.'" (quoting *Barto v. Shore Constr., LLC*, 801 F.3d 465, 475 (5th Cir. 2015)). This calculation further assumes that any periods of nonparticipation in the labor force

---

[171]   Testimony of Kimeline Badeaux.
[172]   Exhibit J-7 at 2 (Boudreaux Report).
[173]   *Id.*

"would occur at the end of [Badeaux's] worklife, which assumption may produce overestimates of present values."[174]   Boudreaux states that there is currently no generally accepted statistical alternative to this assumption. The Court credits this calculation of work-life expectancy.

To calculate plaintiff's total lost income stream, the Court further finds that plaintiff can return to work in a sedentary role, and be paid a wage starting at the average of the bottoms of the wage ranges provided by his expert, Dr. Stokes.[175]  The Court further assumes that his wages will increase after three years to the average of the medians of Dr. Stokes's wage ranges.[176] Based on these assumptions, and discounting for present value,[177] the Court finds that plaintiff is entitled to $783,489.17 in future lost wages.[178]

## B.    Fringe Benefits

Badeaux is also entitled to any loss of fringe benefits caused by his accident.  *See, e.g.*, *McGee v. Rowan Cos., Inc.*, No. 08-4715, 2009 WL 3150309, at *3 (E.D. La. Sept. 24, 2009) (Barbier, J.) (awarding fringe

---

[174]    *Id.*

[175]    *See* Exhibit J-9 at 10 (Stokes Report).

[176]    *Id.*

[177]    Exhibit J-7 at 5 (Boudreaux Report) (Dr. Boudreaux's explanation of his method of discounting future loss to present value).

[178]    *See id.* at 9 (midpoint of reasonable range, based on future wage increase to $33,235.00 per year).

benefits to a Jones Act seaman); *Williams v. Reading & Bates Drilling Co.*, 750 F.2d 487, 490 (5th Cir. 1985) (affirming the district court's award for loss of fringe benefits to a Jones Act seaman).  Only Dr. Rice, plaintiff's economic expert, submits a calculation as to lost fringe benefits.  He estimates that the present values of plaintiff's future lost fringe benefits are $320,190.00 in health insurance, and $12,582.00 in dental insurance.[179] Defendants' expert, Dr. Boudreaux, offers no calculations on these items because he reportedly did not have "detailed information as to any fringe benefits" at the time of his report.[180]

In assessing plaintiff's entitlement to future lost fringe benefits, the Court again assumes that plaintiff will return to work in a sedentary role.[181] The Court further concurs with Dr. Boudreaux that, if Badeaux returns to work "in almost any capacity, the most economically important fringe benefits are unlikely to be lost."[182]  The Court therefore rejects Dr. Rice's calculations as to future lost fringe benefits, because his analysis makes no mention of a return-to-work assumption.  Based on the assumption that plaintiff's return to work will be accompanied by health and dental

---

[179]   Exhibit J-10 at 3 (Rice Report).
[180]   Exhibit J-7 at 4 (Boudreaux Report).
[181]   *See* Exhibit J-9 at 10 (Stokes Report).
[182]   Exhibit J-7 at 3 (Boudreaux Report).

insurance, the Court finds that plaintiff is not entitled to any damages for loss of fringe benefits.

### C.   Medical Expenses

#### 1.   Past Medical Expenses

As to plaintiff's past medical expenses, it is well established that a seaman "clearly can receive only one recovery for his medical expenses." *Brister*, 946 F.2d at 361.  Accordingly, plaintiff cannot recover tort damages that are duplicative of his cure awards.  *See Boudreaux*, 280 F.3d at 469; *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 639 (E.D. La. 2007) (Fallon, J.).  Here, records indicate that Eymard has paid cure payments totaling $178,492.25 for plaintiff's medical bills.[183]   Thomas Halverson testified that the medical providers have accepted full payment for all claims, and that no significant charges remain outstanding.[184]   Furthermore, the Court has found that plaintiff reached MMI on June 17, 2021.  His treatment

---

[183]   Exhibit J-38 at 6 (Eymard Record of Badeaux's Medical Bills and Cure Payments).

[184]   Trial Testimony of Thomas Halverson.  Halverson testified that he recently received a bill totaling around $95.00. *Id.* With the exception of this uncertain testimony by Halverson, no other medical expenses appear in the record.  The Court confines the basis of its medical-expenses calculation to Exhibit J-38, as jointly submitted by the parties.

after this date consists largely of narcotic pain medication and monthly visits with Dr. Liechty.[185]   The Court finds that Badeaux is not entitled to any medical expenses that postdate June 17, 2021.  Because plaintiff "can receive only one recovery for his medical expenses," *Brister*, 946 F.2d at 361, and because all of his pre-MMI expenses have been covered by Eymard's cure payments, plaintiff is not entitled to any damages for past medical expenses.

### 2.    *Future Medical Expenses*

To assess plaintiff's entitlement to future medical expenses, the Court consults the report of plaintiff's vocational-rehabilitation expert, Dr. Larry Stokes.[186]  Dr. Stokes provides a range of possible future medical costs, based on a lifecare plan.  The lifecare plan assumes that plaintiff will require physical therapy, routine and post-operative care by a neurosurgeon, evaluations for pain management and determinations of physical-therapy needs, labs, diagnostics, and medication.[187]

The Court finds that plaintiff is not entitled to any damages for future medical expenses.  As an initial matter, Dr. Stokes's report was prepared on

---

[185]   *See* Exhibit J-38 at 4-6 (Eymard Record of Medical Bills and Cure Payments).

[186]   Exhibit J-9 at 10-13 (Stokes Report).

[187]   *Id.* at 10-12.

January 19, 2021,[188] nearly nine months before this trial. Therefore, some of the "future" treatment should have already occurred. Specifically, the life-care plan includes expenses for six months of post-operative visits with a neurosurgeon, four months of post-operative Percocet prescriptions, and a post-operative pain-management "evaluation."[189]   At the time of trial, plaintiff was already eleven months out from his last operation. Further, Dr. Liechty testified that his immediate goal is to wean plaintiff off his narcotic medications.[190]   Accordingly, plaintiff is not entitled to these costs as part of a future-medicals award.

The remaining items are purely speculative, and find no support in the record. Specifically, there is no reliable evidence indicating that plaintiff will require three visits to a neurosurgeon every five years for the rest of his life,[191] nor that he will undergo a SPECT/CT scan once every five years for the rest of his life.[192]   Dr. Stokes states that his recommendations are based on "a review of medical records, information gathered during [plaintiff's] interview, consultation with Dr. Liechty, and research regarding the

---

188    *Id.* at 1.
189    *Id.* at 11-12.
190    Trial Testimony of Dr. Peter Liechty.
191    Exhibit J-9 at 10 (Stokes Report).
192    *Id.* at 12.

standards of care for this type of injury,"[193] but he offers no specific evidence supporting the items he includes in plaintiff's life-care plan. Indeed, the only specific source named alongside Dr. Stokes's recommendations is Dr. Liechty. For every item in the life-care plan, the corresponding "Comments" field notes that the recommendation is "[p]er Dr. Liechty."[194] These unsupported conclusions by Dr. Liechty about treatment far into the future are speculative and therefore rejected.

Furthermore, the projection that plaintiff will attend physical therapy in the future is inconsistent with the record. At trial, plaintiff testified that he did not complete physical therapy following his hardware-removal surgery.[195] And patient records from 2019, during which time plaintiff was reporting ongoing, severe pain, indicate that he did not attend physical therapy as instructed by Dr. Pourtaheri.[196] The Court finds that plaintiff is not entitled to damages for these unfounded and speculative medical costs. *See Semien v. Parker Drilling Offshore USA LLC*, 179 F. Supp. 3d 687, 718 (W.D. La. 2016) (denying a seaman future medical expenses because "any such award would be overly speculative in nature"); *cf. Pallis v. United*

---

[193]    *Id.* at 10.

[194]    *Id.* at 10-12.

[195]    Trial Testimony of Clifton Badeaux.

[196]    Exhibit J-23 at 65 (Gulf Coast Orthopedics Patient Records).

*States*, 369 F. App'x 538, 544 (5th Cir. 2010) (affirming the district court's decision to deny a seaman future damages because his arguments were too speculative).

For all of these reasons, the Court finds that plaintiff is not entitled to any damages for future medical expenses.

### D.    General Damages

Plaintiff is also entitled to recover general damages for pain and suffering, and loss of enjoyment of life.  *Sosa v. M/V LAGO IZABAL*, 736 F.2d 1028, 1034 (5th Cir. 1984) (citations omitted).  The "amount awarded for pain and suffering depends to a great extent on the trial court's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation."  *Luwisch*, 956 F.3d at 331 (quoting *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1357 (5th Cir. 1988)).

Here, the Court finds that Badeaux experienced significant pain and suffering, and loss of enjoyment of life, as a result of his injuries.  Plaintiff underwent three significant surgeries on his back.  His medical records indicate that he experienced ongoing pain for over two years following his

accident.[197]  Furthermore, plaintiff testified that, as of the date of trial, nearly three years after the accident, he continues to experience pain.[198]  Plaintiff and his wife testified that plaintiff can no longer engage in activities he enjoyed before his accident, including fishing from a boat, riding a four-wheeler, and cutting grass.[199]  He testified that he cannot ride in a car for long periods without a break, making travel difficult.[200]  His wife testified that plaintiff cannot hold his grandchild for more than a minute or two, because she is too heavy.[201]

For these reasons, the Court awards plaintiff $250,000 in past pain and suffering, and $250,000 for future pain and suffering, for a total of $500,000 in general damages.  *See Dunn v. Marquette Transportation Co., LLC*, No. 16-13545, 2017 WL 3887521, at *12 (E.D. La. Sept. 6, 2017) (Fallon, J.), *aff'd*, 744 F. App'x 888 (5th Cir. 2018) (awarding $500,000 to a seaman

---

[197]  *See, e.g.*, Exhibit J-25 at 14 (Jefferson Orthopedic Clinic Records) (reporting a pain level of 10 out of 10); Exhibit J-23 at 13 (Gulf Coast Orthopedics Records indicating "persistent back pain" on July 22, 2019, seven months after the accident); *id.* at 43 (Gulf Coast Orthopedics Records indicating pain at a "6 to 9" out of 10 pre-kyphoplasty, and "4 to 5" out of 10 post-kyphoplasty); Exhibit J-27 at 279 (Physical Therapy Records reporting "9 out of 10" pain on July 8, 2021, over two and a half years after the accident).

[198]  Trial Testimony of Clifton Badeaux.

[199]  *Id.*; Trial Testimony of Kimeline Badeaux.

[200]  Trial Testimony of Clifton Badeaux.

[201]  Trial Testimony of Kimeline Badeaux.

who suffered a hip fracture and lumbar spine injuries); *Graham v. Offshore Specialty Fabricators, Inc.*, 37 So.3d 1002, 1019 (La. App. 1 Cir. 2010) (awarding $225,000 for a lumbar fusion with severe pain); *Zeno v. Great Atl. & Pac. Tea Co.*, 803 F.2d 178, 181-82 (5th Cir. 1986) (looking to similar cases to determine damages).

### E.    Pre-Judgment Interest

In admiralty, the Court has the discretion to award pre-judgment interest.  There is a strong presumption in favor of awarding pre-judgment interest, and it will usually be denied only in cases in which the plaintiff exercised undue delay in bringing his action.  *United States v. Ocean Bulk Ships, Inc.*, 248 F.3d 331, 344 (5th Cir. 2001).  When a Jones Act case is tried to a jury, the Court may not award pre-judgment interest, but when a Jones Act case is tried to the Court, it may award pre-judgment interest. *McPhillamy v. Brown & Root*, 810 F.2d 529, 532 (5th Cir. 1987); *Bush v. Diamond Offshore Co.*, 46 F. Supp. 2d 515, 523 (E.D. La. 1999).  It is within the discretion of the Court to select an equitable rate of pre-judgment interest.  *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991). The Court finds no delay here and that plaintiff is thus entitled to receive pre-judgment interest at 0.20 percent, which is the most recently quoted rate for

one-year constant-maturity treasury bills,[202] from the date of judicial demand until the date of payment.  Pre-judgment interest may be awarded only on damages that have actually accrued as of the date of judgment. *Martin v. Walk, Haydel & Assocs., Inc.*, 794 F.2d 209, 212 (5th Cir. 1986).

## III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ADM/ARTCO'S CROSS-CLAIM

Eymard performed work for ADM/ARTCO pursuant to a Time Charter Agreement, which provided that Eymard would employ its vessel, the M/V PEARL C. EYMARD, "in the movement of barges primarily in the vicinity of [ADM's] export facility in Destrehan, Louisiana."[203]  ADM/ARTCO asserts that, under the Time Charter Agreement, Eymard owes defense and indemnity to ADM/ARTCO.

Under the Time Charter Agreement, Eymard was the "Owner," and ADM the "Charterer."[204]  The Agreement contains a Hold Harmless & Indemnity provision, which states that:

> Owner agrees and binds itself to protect, defend, indemnify and hold harmless Charterer, its affiliated or related companies, their employees, agents, underwriters and

---

[202]  U.S. Dep't of the Treasury, *Daily Treasury Yield Curve Rates* (Nov. 29, 2021), https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/textview.aspx?data=yield.

[203]  Exhibit J-3 at 1 (Time Charter Agreement).

[204]  *Id.*

> insurers, from and against any claim, demand, suit, loss or liability, for damages, personal injury or death, to all persons and/or third parties and to property arising out of or in any way connected with the operation of Owner's Vessel and/or the performance of this contract, and/or the negligence of Owner's officers or employees, whether such death, personal injury or property damage is caused by the fault or negligence in whole or in part of Charterer or the sole fault or negligence of Charterer or by the unseaworthiness of any vessel.[205]

Under federal maritime law, "a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous." *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332-33 (5th Cir. 1981) (citing *Hicks v. Ocean Drilling & Expl. Co.*, 512 F.2d 817, 825 (5th Cir. 1975)). Furthermore, "under general maritime law, indemnification for an indemnitee's own negligence must be 'clearly and unequivocally expressed.'" *East v. Premier, Inc.*, 98 F. App'x 317, 319 (5th Cir. 2004) (quoting *Seal Offshore, Inc. v. Am. Standard, Inc.*, 736 F.2d 1078, 1081 (5th Cir. 1984)). The Court must therefore ask whether the indemnity provision, "as written, 'clearly and unequivocally' provides that the indemnitor will be liable to the indemnitee even when such injuries are caused by [the indemnitee]'s own negligence." *Id.* at 320.

---

[205]   *Id.* at 6.

72

Here, the provision specifies that indemnity is owed to ADM, "its affiliated or related companies, their employees, agents, underwriters and insurers."[206]  But as to negligence, it merely states that indemnification is owed "whether such, death, personal injury or property damage is caused by the fault or negligence in whole or in part of [ADM]."[207]  The provision does not mention the negligence *of affiliated or related companies*, such as ARTCO.

The Fifth Circuit addressed a similar linguistic discrepancy in *Curtis Callais Welding, Inc. v. Stolt Comex Seaway Holdings, Inc.*, 129 F. App'x 45 (5th Cir. 2005).  Applying general maritime law, the court explained that "the service agreement was conspicuously *silent* as to whether Stolt Offshore would be required to defend and indemnify Callais Welding's *employees, subsidiaries or affiliates, and any of their employees*, if a suit was brought against Callais Welding by Stolt Offshore, its employees, subsidiaries or affiliates, or any of their employees."  *Id.* at 47.  It went on to explain that, "[a]s a result of this silence, the district court concluded that the amendment required Stolt Offshore and its subsidiaries and affiliates to defend and indemnify *only* Callais Welding from suits brought by Stolt Offshore, its

---

[206]    *Id.*

[207]    *Id.*

employees, subsidiaries or affiliates, or any of their employees." *Id.* (emphasis added). The Fifth Circuit agreed, finding that "it is clear from [their] reading of the plain language of the service agreement that the parties did not intend for [the indemnitor's] duty of defense and indemnification to expand beyond the coverage of Callais Welding . . . ." *Id.* at 55.

Based on similar reasoning here, the Court finds that the Time Charter Agreement does not, "as written, 'clearly and unequivocally' provide[] that [Eymard] will be liable to [ADM/ARTCO] even when [the] injuries are caused by [ARTCO]'s . . . negligence." *East*, 98 F. App'x at 320. The Court finds no ambiguity as to the scope or meaning of the indemnity provision in the Time Charter Agreement. Accordingly, the Court concludes that Eymard does not owe defense and indemnity to ADM/ARTCO for ARTCO's negligence.

## IV.   SUMMARY

On the basis of the foregoing findings of fact and conclusions of law, the Court finds that the plaintiff, Clifton Badeaux, has sustained damages due to the negligence of Eymard and ARTCO, and the unseaworthiness of the M/V PEARL C. EYMARD.  Accordingly, plaintiff is entitled to recover from Eymard and ARTCO the following damages:

| | |
|---|---|
| Past Wage Loss | $174,235.57 |
| Future Wage Loss | $783,489.17 |
| Fringe Benefits Loss | $0.00 |
| Past Pain and Suffering | $250,000.00 |
| Future Pain and Suffering | $250,000.00 |
| Past Medical Expenses | $0.00 |
| Future Medical Expenses | $0.00 |
| Total Damages | $1,457,724.74 |

The Court apportions fault for plaintiff's injuries as follows:

| | |
|---|---|
| Plaintiff | 50% |
| Eymard | 25% |
| ARTCO | 25% |

Adjusting for plaintiff's contributory negligence, plaintiff is entitled to a total award of **$728,862.37**.  Badeaux is entitled to pre-judgment interest on past damages from the date of judicial demand until the date paid, and he is entitled to post-judgment interest on all remaining damages from the date

of judgment until the date paid.  Both pre- and post-judgment interest is to be calculated at a 0.20 percent per annum rate.

Further, Eymard is entitled to an offset credit of $9,172.69, to reflect its post-MMI payments of $5,060.00 in maintenance and $4,112.69 in cure.

Eymard does not owe ADM/ARTCO defense and indemnity for damages arising out of ARTCO's negligence.

New Orleans, Louisiana, this __29th__ day of November, 2021.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE